26 U.S. 386 (____)
1 Pet. 386
JOHN CONARD
vs.
THE ATLANTIC INSURANCE COMPANY NEW YORK
Supreme Court of United States.

*400 To all which the defendant's counsel excepted, and the Judges sealed a bill of exceptions.
Mr. Ingersoll, for the plaintiff in error.
Binney for the defendants in error. &mdash.
Mr. Webster, also for the defendants.
*434 Mr. Justice STORY delivered the opinion of the Court. 
This is an action of trespass, de bonis asportatis, brought in the Circuit Court, for the district of Pennsylvania, by the Atlantic Insurance Company, to recover against the defendant John Conard, the Marshal of that district, the value of certain teas, shipped on board the ships Addison and Superior, and levied upon by him, upon an execution, in favour of the United States, against one Edward Thomson, as the property of the latter. The real question in the cause is, whether the Insurance Company or the United States, are entitled to the teas or their proceeds.
The material facts, disclosed at the trial in the Circuit Court, were, as follows:  Edward Thomson was a merchant, largely engaged in trade in the city of Philadelphia, in the year 1825; and on the 21st day of June of that year, borrowed, at respondentia, of the Insurance Company, the sum of 21,000 dollars, upon goods, &c. on board of the ship Addison, of that port, on a voyage, at and from Philadelphia, to Canton, and at and from thence, back to Philadelphia; beginning the risk, on the 21st of the preceding April; about which time the ship had sailed on the voyage. Edward Thomson had shipped on board of the Addison, for his own account and risk, for the voyage, 21,000 Spanish dollars, consigned to J.R. Thomson, his agent and his assigns, and deliverable to him in Canton; and regular bills of lading were accordingly signed; one of which, was retained by the shipper. At the time of the execution of the respondentia bond, a memorandum of agreement was entered into by the parties, and an assignment made on the back of this bill of lading. The form and effect of these instruments, will be matter of more particular comment hereafter; at present it is only necessary to add, that the loan purports, on the face of the bond, to be a loan for the joint account of E. Thomson, E.H. Nicoll, F.H. Nicoll, and F.S. Bailey; but in reality, the transaction was for the use and benefit of E. Thomson, and the goods shipped in the Addison, were on his sole account.
On the 14th July of the same year, a loan was made to Edward Thomson, of 13,960 dollars, on goods on board the ship Superior, which had sailed on a similar voyage, on the 6th of June preceding. *435 A respondentia bond was taken in the same form, from the same parties, on the like voyage, with a similar memorandum of assignment of the bill of lading. The only difference between the transactions was, that this loan was applied in part payment of a former loan, made by the Insurance Company on another ship of E. Thomson's. On the 19th of November E. Thomson, having become insolvent, made a general assignment of all his property to Peter Mackie, and Richard Renshaw; for the use of his creditors. At this time, he was very largely indebted to the United States on duty bonds. The Addison left Canton on her return to Philadelphia, having among her papers a bill of lading of the proceeds of the 21,000 dollars, consigned by the shipper (Mr. Fisher attorney for J.R. Thomson,) to order, in blank, and endorsed, in blank, by the shipper, and marked No. 5. This mark was to identify them as the proceeds of the 21,000 dollars. Mr. Fisher also gave the master a manifest, stating the cargo to be consigned to E. Thomson, and a general bill of lading of the whole cargo, consigning it to E. Thomson. The invoice and bill of lading were dated 22d November 1825. The general bill of lading was not signed. The Superior left Canton, having among her papers a bill of lading of certain articles, valued in the invoice at 3393 dollars, consigned to Peter Mackie, and also a bill of lading of certain articles, valued at $1139 86, consigned to Barclay Army, and both dated 2d December 1825. Before the arrival of these ships in America, the United States had obtained judgments against E. Thomson, for large sums of money due upon his bonds at the Custom House. Both ships arrived in Delaware Bay, almost at the same time; and an execution issued on behalf of the United States, on one of the judgments against E. Thomson, on the 13th March 1826, and was levied on the ships and their cargoes, on the 15th of March while they were yet in the bay. It was under this levy, that the goods in controversy were seized by the marshal.
Two or three days before the ships came up to Philadelphia, Peter Mackie, the assignee of E. Thomson, having received duplicates of the invoice and bills of lading of the cargo of the Addison, delivered them to the agents of the Insurance Company at Philadelphia; and upon the arrival of the ship itself, handed over, to the same agent, the invoices and bills of lading, brought by the master. On the 22d of March 1826, Peter Mackie and Barclay Army endorsed to the Insurance Company the invoices and bills of lading, which came to their order by the Superior. These papers came under cover to Edward Thomson, several being enclosed in the same envelop; and Mackie allotted-them to their respective owners, by means of the numbers endorsed upon them. These numbers were originally *436 placed upon the outward and homeward bills of lading, and invoices, for the purpose of designating the proceeds of each particular shipment. It appeared, that part of the 13,960 dollars, borrowed of the Insurance Company on the goods in the Superior, was expended in disbursements in Canton; and the two invoices to Mackie and Arny, were consigned to them contrary to instructions; and they assigned them to the Insurance Company, under the belief that they were the proceeds of the outward shipment pledged for the loan. The reason assigned for there being a manifest and general bill of lading, consigning the cargo to Edward Thomson, was to enable him to enter the cargo in his own name, after he had settled with the Insurance Company, and paid the respondentia loans. The several particular invoices and bills of lading, were then to be cancelled, and the master was to sign the general bill of lading, and the cargo was to be entered at the Custom House, in the name of E. Thomson. He was in the habit of taking up other large sums, at respondentia, and this was the usual course of his arrangements in business.
Such is the general outline of the case. The loan on the shipment in the Superior, as has been already stated, differs from that on the shipment in the Addison, only in the circumstance that it was applied in discharge of a prior loan. In our judgment, that makes no difference, as to the legal rights of the parties. The borrower had a right to apply the loan in any manner he pleased; and the mode of its application, if it be otherwise bona fide, and legal, does not change the posture of the rights of the lender. We shall therefore dismiss, at once, all further consideration of this point; and treat both cases, as if they stood on a single shipment.
Several objections have been taken to these respondentia bonds, to impeach their original validity. It is said, that they ought to be treated as usurious, or gaming contracts; that they are not to be deemed bona fide transactions, upon real risks; but transactions void in point of law, upon their face. So far as the questions of usury, or gaming, or bona fides, upon substantial risks, are matters of fact, they were left fully open, and have been passed upon by the jury, who have found a verdict against them; so far as there are matters of law apparent upon the record, proper to avoid the bonds, they are still open for inquiry. Two grounds have been relied on for this purpose; First, that the loans were made after the sailing of the ships on the voyage; and Secondly, that the money loaned was not appropriated to the purchase of the goods put on board, and was not the identical property, on which the risk was run. In our judgment, neither of these objections can be sustained. It is not necessary that *437 a respondentia loan should be made before the departure of the ship, on the voyage, nor that the money loaned should be employed in the outfit of the vessel, or invested in the goods on which the risk is run. It matters not, at what time the loan is made; nor upon what goods the risk is taken. If the risk of the voyage be substantially and really taken; if the transaction be not a device to cover usury, gaming, or fraud; if the advance be in good faith, for a maritime premium; it is no objection to it, that it was made after the voyage was commenced, nor that the money was appropriated to purposes wholly unconnected with the voyage. The lender is not presumed to lend upon the faith of any particular appropriation of the money; and if it were otherwise, his security could not be avoided by any misapplication of the fund, where the risk was bona fide run upon other goods, and it was not a mere contract of wager and hazard. What could be the effect, if it were a mere wagering contract, it is unnecessary to consider; because there is the clearest proof here, that there was property on board belonging to the borrower, and sailing on the voyage at his risk.
The form of the respondentia bond in the present case is, as far as we know, the common and usual form. The only deviation from the actual facts is, that it seems in some of its provisions to contemplate the voyage as not then commenced. This probably arose from using the common printed form, which is adapted to that, as the ordinary case. But it misled no one, and was certainly perfectly understood by the parties. The risk was taken for the whole voyage, precisely as if the ships had been then in port; and, if before the bonds were given, the property had been actually lost, by any of the perils enumerated in it, it is clear that the loss must have been borne by the lenders. They could not have recovered it back, since the event was one within the scope and contemplation of the contract. The safety then of the property, at that particular period, does not vary the rights of the parties; and from the very nature of the transaction, it must have been utterly unknown to both, whether the ship was at the time, in safety or not. They entered into the contract, upon the usual footing of policies of insurance, lost, or not lost. So far as this deviation from the fact bore upon the point of the good faith and reality of the contract, as a genuine maritime loan, it was left to the jury to draw such inferences, as upon the whole circumstances, they were warranted to draw. The charge of the learned Judge, in the Circuit Court, was as favourable to the defence on this point as it could be upon the principles of law.
The next question is, in whom was the property in the shipment vested, at the time of the levy of the execution of the United States. Was it so vested in the Insurance Company, *438 either in law or equity, that they are now entitled to maintain the present suit; or in other words, to recover the proceeds in the marshal's hands? This depends upon the view taken of the objects, intentions, and acts of the parties, as disclosed in the bonds, and the accompanying papers. When these are once ascertained and settled, it will not be difficult to arrive at the proper legal conclusion.
It is contended, on behalf of the United States, that no title or interest in the property shipped, passed by the instruments taken collectively, to the Insurance Company; that Edward Thomson remained the sole owner of the goods, and their proceeds, during the whole voyage; that at most, the Insurance Company had but a lien upon them for the security of their debt, which was displaced by the priority of the United States; and, finally, that if the Insurance Company had any title or interest in the property, it was not absolute, but by way of mortgage; and even this, coming in competition with the priority of the United States by operation of law, yields to their superior privilege.
Before proceeding to the discussion of the right of the Insurance Company over the property in question; it may be well to consider, what is the nature and effect of the priority of the United States, under the statute of 1799, ch. 128. Although that subject has been several times before this Court, the observations which have fallen from the bar, show, that the opinions of the Court have, sometimes, not been understood according to their true import. The 65th section of the Act declares, that "in all cases of insolvency, or where any estate in the hands of executors, administrators, and assignees, shall be insufficient to pay all the debts due from the deceased, the debt or debts due to the United States &c. shall be first satisfied; and any executor, administrator, or assignees, or other person, who shall pay any debt due by the person or estate, from whom, or for which they are acting, previous to the debt or debts due to the United States from such person or estate, being first duly satisfied, and paid; shall become answerable in their own person and estate, for the debt, or debts so due to the United States, or so much thereof, as may remain due and unpaid; and actions or suits at law may be commenced against them for the recovery of the said debt or debts, or so much thereof as may remain due and unpaid, in the proper Court having cognizance thereof." A subsequent clause of the same section declares, that, "the cases of insolvency mentioned in this section, shall be deemed to extend, as well to cases, in which a debtor not having sufficient property to pay all his or her debts, shall have made a voluntary assignment thereof for the benefit of his or her creditors, or in which the *439 estate and effects, of an absconding, concealed, or absent debtor, shall have been attached by process of law; as to cases, in which an act of legal bankruptcy, shall have been committed." It is obvious, that this latter clause is merely an explanation of the term "insolvency," used in the first clause; and embraces three classes of cases, all of which relate to living debtors. The case of deceased debtors, stands wholly upon the alternative in the former part of the enactment. Insolvency then, in the sense of the statute, relates to such a general divestment of property, as would in fact be equivalent to insolvency in its technical sense. It supposes, that all the debtor's property has passed from him. This was the language of the decision in the case of the United States vs. Hooe (3 Cranch, 78;) and it was consequently held, that an assignment of part of the debtor's property, did not fall within the provision of the statute. So too a mere inability of the debtor to pay all his debts, is not an insolvency within the statute; but it must be manifested, in one of the three modes pointed out in the explanatory clause already referred to. That was the point, on which the case of Prince vs. Bartlett, (8 Cranch, 431,) turned.
What then is the nature of the priority, thus limited and established in favour of the United States? Is it a right, which supersedes and overrules the assignment of the debtor, as to any property which the United States may afterwards elect to take in execution, so as to prevent such property from passing by virtue of such assignment to the assignees? Or, is it a mere right of prior payment, out of the general funds of the debtor, in the hands of the assignees? We are of opinion that it clearly falls, within the latter description. The language employed is that which naturally would be employed to express such an intent; and it must be strained from its ordinary import, to speak any other.
Assuming that the words "in all cases of insolvency," indicate an entire class of cases, and that the other member of the sentence "or when any estate," &c., is to be read distributively, as has been contended for, on behalf of the United States it does not, in the slightest degree, vary the construction of the statute. It will then read, that "in all cases of insolvency, the debt or debts due to the United States, &c., shall be first satisfied."
But how are they to be satisfied? Plainly, as the succeeding clause demonstrates, by the assignees; who are rendered personally liable, if they omit to discharge such debt or debts. To enable the assignees to pay the United States, it is indispensable that the fund should pass to them; and if the mere priority of the United States intercepted it, or gave a right to defeat it, the object of the statute would not be accomplished. *440 If the legislature had intended to defeat the passing of the property to the assignees, as against debts due to the United States, the natural language in which such an intention would be clothed, would be to declare, that so far, such assignments should be void. Then again, the very enumeration of the cases of insolvency, in all of which the assignment passes, and is to pass the whole of the debtor's property, confirms the interpretation already asserted. They are the very cases, where by law there is no exception as to the extent or operation of the assignment to divest the debtor's estate. One of these is the case of a legal bankruptcy; and in the Act on this subject, passed in the next session of Congress, there is an express provision, in the 62d section, that "nothing contained in this law shall in any manner affect the right or preference to prior satisfaction of debts due to the United States," as secured or provided, by any law heretofore passed. Yet the bankrupt Act contains no exception as to the property to be passed to the assignees, in favour of any person. In the case of the United States vs. Fisher et al. 2 Cranch, 358, which was decided upon great deliberation; this Court held, in the construction of a similar clause in the Act of 3d March 1797, ch. 74, that "no lien is created by this law; no bona fide transfer of property in the ordinary course of business, is overruled. It is only a priority in payment, which under different modifications, is a regulation in common use; and this priority is limited to a particular state of things, when the debtor is living, though it takes effect generally, if he be dead." And this doctrine was again recognized in the United States vs. Hooe, 3 Cranch, 73. 90.
If then the property of the debtor passes to the assignees; if debts due to the United States constitute no lien on such property; if the preference or privilege of the United States be no more than a priority of satisfaction or payment out of a common fund; it would seem to follow, as a necessary consequence, that even if the teas in controversy, were the property of Edward Thomson, they passed by his general assignment, in November 1825, (which is not denied to have been a bona fide, and valid transaction,) to his assignees; and become their property for distribution among his creditors; and were not liable to the levy under the execution of the United States.
That, however, would be a question merely between the United States and the assignees, and would in no shape help the Atlantic Insurance Company to maintain their present suit.
Then, again, it is contended on behalf of the United States, that the priority thus created by law, if it be not of itself *441 a lien, is still superior to any lien, and even to an actual mortgage, on the personal property of the debtor.
It is admitted, that where any absolute conveyance is made, the property passes so as to defeat the priority; but it is said that a lien has been decided to have no such effect; and that in the eye of a Court of Equity a mortgage is but a lien for a debt. Thelluson vs. Smith, (2 Wheat. 396,) has been mainly relied on, in support of this doctrine. That case has been greatly misunderstood at the bar, and will require a particular explanation. But the language of the learned Judge who delivered the opinion of the Court, in that case, is conclusive on the point of a mortgage. "The United States," said he, "are to be first satisfied; but then it must be out of the debtor's estate. If, therefore, before the right of preference has accrued to the United States, the debtor has made a bona fide conveyance of his estate, to a third person; or has mortgaged the same to secure a debt  or if his property has been seized under a fieri facias, the property is divested out of the debtor, and cannot be made liable to the United States." The same doctrine may be deduced from the case of United States vs. Fisher, (2 Cranch, 358,) where the Court declared, that "no bona fide transfer of property in the ordinary course of business, is overreached by the statutes;" and "that a mortgage is a conveyance of property, and passes it conditionally to the mortgagee." If so plain a proposition required any authority to support it, it is clearly maintained in United States vs. Hooe, (3 Cranch, 73.)
It is true, that in discussions in Courts of Equity, a mortgage is sometimes called a lien for a debt. And so it certainly is, and something more; it is a transfer of the property itself, as security for the debt. This must be admitted to be true at law; and it is equally true in equity; for in this respect equity follows the law. It does not consider the estate of the mortgagee as defeated and reduced to a mere lien, but it treats it as a trust estate, and according to the intention of the parties, as a qualified estate, and security. When the debt is discharged, there is a resulting trust for the mortgagor. It is therefore only in a loose and general sense that it is sometimes called a lien, and then only by way of contrast to an estate absolute, and indefensible. But it has never yet been decided, by this Court, that the priority of the United States will divest a specific lien, attached to a thing, whether it be accompanied by possession, or not. Cases of lien, accompanied by possession, are among others; the lien of a ship's owner to detain goods for freight; the lien of a factor on the goods of his principal for balances due him; the lien of an artisan for work and services upon the specific thing. On the other hand, there are liens *442 where the right is perfect, independent of possession; as the lien of a scaman for wages, and the lien of a bottomry holder on the ship for the sum loaned. In none of these cases has it ever been decided, that in a conflict of satisfaction out of the thing itself, the priority of the United-States cut out the lien of the particular creditor. And before such decision is made, it will deserve very grave deliberation, and a marked attention, to what fell from the Court, in Nathan vs. Giles, (5 Taunt. 558. 574.) At present it is wholly unnecessary to decide it, for reasons which will hereafter appear. The case of Thelluson vs. Smith, (2 Wheat. 396,) is not understood to justify any such conclusion. That case turned upon its own particular circumstances. A judgment, nisi, was obtained against Crammond on the 20th of May 1805, in favour of Thelluson and others. On the 22d of the same month he executed a general assignment of all his estate to trustees for the payment of his debts. At that time he was indebted to the United States, on several duty bonds, which became due at subsequent periods. Suits were instituted on these bonds, as they severally became due, and judgments were obtained and executions issued against Crammond, under which a landed estate called Sedgely, was levied upon and sold by the marshal; and the action was brought by Thelluson and others, against the marshal, to recover the proceeds of this sale in his hands. No execution had ever issued upon the judgment of Thelluson and others against Crammond, and of course there had been no levy under that judgment on the Sedgely estate, before or after the levy in favour of the United States. It was admitted, that in Pennsylvania a judgment constitutes a lien on the real estate of the judgment debtor; and it was assumed by this Court, in the argument of the cause, that the judgment of Thelluson and others, bound the estate from the 20th of May, when it was entered, nisi, although in fact it was not finally entered, until nearly a year afterwards. The posture of the case then was, that of a judgment creditor seeking to recover the proceeds of a sale of land sold under an adverse execution, out of the hands of the marshal; upon the ground of his having a mere general lien, by his judgment, on all the lands of his debtor; that judgment never having been consummated, by any levy on the land itself. The Court decided that the action was not maintainable. The reasons for that opinion are not, owing to accidental circumstances, as fully given as they are usually given in this Court. But the arguments of the counsel, point out grounds upon which it may have proceeded, without touching the general question of lien. The plaintiffs were entitled to recover only, upon the ground that they could establish in themselves a rightful title to the proceeds. Whether the land *443 itself was rightfully sold under the execution of the United States, or any title to it passed by the sale, as against the assignees of Crammond, was not matter of inquiry in that case. However tortious or invalid it might be, still, if the plaintiffs had no title to the proceeds, they must fail in their action. Under the general assignment of the debtor, the priority of the United States attached; and if the assignees were willing to acquiesce in the sale, the right of the United States to hold the proceeds, could not be disturbed by third persons. Now, it is not understood that a general lien by judgment on land, constitutes, per se, a property, or right, in the land itself. It only confers a right to levy on the same, to the exclusion of other adverse interests, subsequent to the judgment; and when the levy is actually made on the same, the title of the creditor for this purpose relates back to the time of his judgment so as to cut out intermediate incumbrances. But, subject to this, the debtor has full power to sell, or otherwise dispose of the land. His title to it is not divested or transferred by the judgment to the judgment creditor. It may be levied upon by any other creditor, who is entitled to hold it against every other person except such judgment creditor: and even against him, unless he consummates his title by a levy on the land, under his judgment. In that event, the prior levy is, as to him, void; and the creditor loses all right under it. The case stands, in this respect, precisely upon the same ground as any other defective levy, or sale. The title to the land does not pass under it. In short a judgment creditor has no jus in re, but a mere power to make his general lien effectual, by following up the steps of the law, and consummating his judgment by an execution and levy on the land. If the debtor should sell the estate, he has no right to follow the proceeds of the sale, into the hands of vendor or vendee; or to claim the purchase money in the hands of the latter. It is not like the case where the goods of a person have been tortiously taken and sold, and he can trace the proceeds, and, waiving the tort, chooses to claim the latter. The only remedy of the judgment creditor is against the thing itself, by making that a specific title which was before a general lien. He can only claim the proceeds of the sale of the land, when it has been sold on his own execution, and ought to be applied to its satisfaction. To this state of things, the language of the Court in Thelluson vs. Smith is to be applied, when it is said, that if the debtor's property is seized under a fi. fa. it is divested out of the debtor, and cannot be liable to the United States. Applying these principles to the facts of that case, it is clear that the Sedgely estate had not been divested out of the debtor by any execution on the judgment of Thelluson and others; that it either remained in *444 the debtor, and was liable to the execution of any other of his creditors, who choose to levy upon it, subject, of course, to have his title overruled by their subsequent levy, when perfected; or, that, subject in like manner, it passed by the assignment, (if that was bona fide,) to the assignees; and in their hands, the United States would have a priority of payment out of it, as general funds, in their hands. The judgment creditors, as such, had no title to any fund in the hands of the assignees, until the priority of the United States was satisfied; for that priority does not yield to any class of creditors, however high might be the dignity of their debts.
The fact, that a judgment creditor has a lien, does not place him in a better situation, as a creditor, over the general funds of the debtor in the hands of the assignees. If he possess such a lien he must enforce it in the manner prescribed by law; and if he does, that may so far affect the interest of the assignees actually subjected to such lien. But it gives him no rights to the fund, until he has perfected his lien according to the course of the law. Until that period, he has merely a power over the property, and not an actual interest in it. This ground is alluded to in that part of the opinion of the Court, where speaking of the priority of the United States, it is said, "the law makes no exception in favour of prior judgment creditors, &c. Exceptions there must necessarily be as to the funds out of which the United States are to be satisfied; but there can be none in relation to the debts due from a debtor of the United States to individuals. The United States are to be first satisfied; but then it must be out of the debtor's estate." The real ground of the decision, was, that the judgment creditor had never perfected his title, by any execution and levy on the Sedgely estate; that he had acquired no title to the proceeds as his property, and that if the proceeds were to be deemed general funds of the debtor, the priority of the United States to payment had attached against all other creditors; and that a mere potential lien on land, did not carry a legal title to the proceeds of a sale, made under an adverse execution. This is the manner in which this case has been understood, by the Judges who concurred in the decision; and it is obvious, that it established no such proposition, as that a specific and perfected lien, can be displaced by the mere priority of the United States; since that priority is not of itself equivalent to a lien.
We may then dismiss any farther consideration of this topic, unless it shall appear that the right of the respondentia holders in the present case, is reduced to a mere general lien; and as to them, at least, (however it may be as to the assignees,) no legal right exists to maintain an action for the proceeds. *445 The attention of the Court will then be at once addressed, to the question, what was the nature and extent of the interest of the Insurance Company in the shipments in question. It is unnecessary to discuss what would have been the rights of the parties, if the respondentia bonds had stood alone; for that is not the posture of this case. The whole instruments must be taken together, and construed as one entire agreement. We must then examine the memorandum, the outward bill of lading and assignments thereon, in connexion with the bond. The bill of lading purports, on its face, to be a shipment by Edward Thomson, of seven kegs containing 21,000 dollars, for account and risk of the shipper; to be delivered at Canton to John R. Thomson, or his assigns. By the well, settled principles of commercial law, the consignee is thus constituted the authorized agent of the owner, whoever he may be, to receive the goods, and by his endorsements of the bill of lading, to a bona fide purchaser, for a valuable consideration, without notice of any adverse interests, the latter becomes as against all the world, the owner of the goods. This is the result of the principle, that bills of lading are transferable by endorsement, and thus may pass the property. It matters not whether the consignee, in such case, be the buyer of the goods, or the factor, or agent of the owner. His transfer in such a case is equally capable of divesting the property of the owner, and vesting it in the endorsee of the bill of lading. And, strictly speaking, no person but such consignee can by an endorsement of the bill of lading, pass the legal title to the goods. But if the shipper be the owner, and the shipment be on his own account, and risk, although he may not pass the title by virtue of a mere endorsement of the bill of lading, unless he be the consignee, or what is the same thing, it be deliverable to his order; yet by any assignment, either on the bill of lading, or by a separate instrument, he can pass the legal title to the same; and it will be good against all persons, except such a purchaser for a valuable consideration, by an endorsement of the bill of lading itself. Such an assignment, not only passes the legal title as against his agents and factors, but also against his creditors, in favour of the assignee. It is unnecessary to cite particular authorities on these points: they will be found supported by the authorities cited at the argument, and by the elementary treatises of Mr. Abbott, Mr. Holt, and Mr. Chitty, on this subject; and particularly by Nathan vs. Giles, 5 Taunt. 558. In the present case Edward Thomson was the owner of the goods, and the consignee was merely his factor. He therefore had full power, notwithstanding the consignment, to pass the title to the property in the bill of lading, by a suitable instrument of assignment and sale against any body, but a purchaser *446 without notice from his consignee, without any actual delivery of the goods themselves, if they were then at sea, and incapable of manual tradition.
The question then is, whether the endorsement upon this bill of lading, constitutes such an instrument? We are of opinion that it does. It purports to be a transfer in presenti; and uses the appropriate phrases of grant. The words are, "for value received, I hereby assign and transfer to the Atlantic Insurance Company of New-York, the within bill of lading, and the specie, goods, &c., to be procured thereon and thereby, and any return cargo, to be obtained &c. by the proceeds thereof; and all the return cargo to be taken on board the within named ship, by or on my account, as collateral security, according to an agreement duly executed, and adjoined to a respondentia bond, &c., (referring to the memorandum hereinafter stated.) This is not a mere assignment of the bill of lading itself, operating as an equitable grant of the interest of the owner in that instrument; but it is of the goods contained in it, and the bill of lading is referred to, by way of description of the subject matter of the grant. There was a valuable consideration for it; and as Edward Thomson was the legal owner of the goods, the words "assign and transfer," are sufficient words of grant to pass his legal title to the same; unless the operation of those words is controlled by some of the other parts of the instrument. The argument admits this; but it supposes, that the accompanying memorandum shows, that such was not the intention of the parties; and therefore the words are to be construed according to that intention; which was to create a mere lien or equity on the part of the Insurance Company, on the goods. Let us then examine the nature and scope of that memorandum. It begins by a recital, that it hath been agreed that the bill of lading for the goods &c. mentioned in the respondentia bond, shall be endorsed to the Insurance Company, as a collateral security for the loan. This is carried into effect by the assignment above mentioned. It then goes on to recite, that it has been further agreed that the property to be shipped homeward, as aforesaid, being the proceeds of the loan, (thus considering the specie on board, as a substituted loan,) shall be for the account and risk of the borrowers; that the bills of lading, therefore, shall express the same, and shall also express that the said property shall be delivered to the order of the shippers; and that the same shall be endorsed in blank, and shall be placed in the hands of the Insurance Company, either before or on the arrival of the said ship, at Philadelphia, as a continuation of such collateral security.
Now, supposing the transaction bona fide, what is there here that controls, even by way of recital, the operation of the words *447 of transfer. If the case were one of absolute transfer, there might be some room for doubt. But here the transfer was as collateral security. It was therefore a mortgage of the goods, and the returns. The shipment out and home, was, as in each case it must be, at the risk, and for the account of the shipper; subject however to the rights of the mortgagee; and the very provision that the bills of lading should be delivered to the order of the shipper, and endorsed in blank, and placed in the hands of the Insurance Company, establishes the fact, that it was the intention of the parties that the property of the return cargo, should rest by such endorsement in them. The memorandum then proceeds to state, that it is expressly declared that the endorsement or consignment shall not be held to exonerate the persons of the borrowers; nor compel the Insurance Company to accept the goods, &c. which may arrive under such bill of lading and consignment, in discharge of such debt; but that it shall be lawful for the company to receive and hold the goods, &c. for ninety days after their arrival at Philadelphia; and if the debt was not then paid, to sell the same at auction, and charge the borrowers with the balance. The plain effect of this stipulation is to avow an explicit understanding, that the assignment of the goods should not put them at the risk of the company, but that they should be deemed collateral security only, and be sold after the limited time, to discharge the debt, pro tanto. So far from the intention being indicated, that no property at all was to pass to the company, the solicitude of the parties seems most carefully employed to repel the notion, that the transfer was absolute and not by way of mortgage, as collateral security. The memorandum, therefore, confirms and does not impugn, in any degree, the natural, construction of the language of the assignment endorsed on the bill of lading, as importing a present transfer. Indeed we may go farther and assert, that the obvious intention of the parties was to give a specific interest in the goods shipped, so as to make them secure against the claims of creditors; and, that to construe the instruments to create no more than a lien, liable to be defeated by the acts of either party, or to be overreached by any privileged creditors, would be, not to follow, but to frustrate their intention. Of what use could this great apparatus of instruments, so anxiously prepared by the parties, be, if it conveyed no jus in re, and left the title of the Insurance Company to the goods, at the mercy of the creditors of Thomson, to be intercepted at any time before it reached their hands, on its arrival. We are therefore of opinion, that the assignment in this case was sufficient to pass a legal title to the shipment and the proceeds thereof, against Thomson and his assignees and creditors. If, indeed, the assignment had been of the outward shipment of *448 goods only, it would have carried the return cargo, purchased with the proceeds; because the product or substitute for the original thing by sale, or otherwise, follows the nature of the thing itself, so long as it can be ascertained as such, and becomes the property of him who was the owner, in the same quality as he held the thing. This is the general principle of law, and has been even extended to cases, where there has been a fraudulent or tortious misapplication of property. The case of Taylor vs. Plumer, 3 Maul & Selw. 562, is directly in point; and contains a large collection of the authorities in the elaborate opinion of the Court, pronounced by Lord Ellenborough. In this view of the matter, the only value of the homeward bill of lading would be as a designation of the proceeds, so as to enable the company to trace and identify them. But the assignment, in terms, transfers the proceeds and returns, and cuts off all possibility of question upon this head. If indeed the title to the proceeds had originally been only an equitable title, and not strictly legal; yet as soon as the company had perfected that equity, by endorsement in blank, and possession of the homeward bills of lading, their right would have been consummated at law, so as to entitle them to maintain a suit therefor. The case of Haille vs. Smith, (1 Bos. & Pull. 563,) was not so strong as the present; and there the Court held, that the property passed, clothed with a trust for the payment of the debt.
If this, then, be the result of the general principles of law, in cases of this nature, what is there to prevent their application to the present case? First, it is said that this debt upon a respondentia bond is of too contingent a nature to uphold a mortgage, as collateral security for the payment of it. We know of no principle or decision, that justifies such a conclusion. Mortgages may as well be given to secure future advances and contingent debts, as those which already exist, and are certain and due. The only question that properly arises in such cases is, the bona fides of the transaction. Then, again, it is said that the papers here disclose a transaction fraudulent in its own nature. But we are of opinion that there is no necessary implication of law on the face of these papers, which stamps it fraudulent; for ought that appears, the agreement may have been entered into with the most sincere and scrupulous good faith; and whether fraudulent or not, in fact, was a question for the jury upon the whole evidence, which was properly left to their consideration; and they have by their verdict negatived the fraud.
The circumstance, that the goods were to be at the risk of the shipper and on their account, does not, of itself, affect either the validity or bona fides of the transfer. That must ordinarily occur, where the transfer is made as collateral security, and it *449 was one of the leading facts in Haille vs. Smith, already cited. 1 Bos. & Pull. 563.
But the main objection relied on, and which indeed constitutes one of the exceptions to the opinion of the Circuit Court. is, that possession of the return shipment was not obtained until after the levy by the United States; and it is contended, that the want of such possession is, per se, a badge of fraud. The Circuit Court on this point decided, "that the actual possession of the above return cargoes, by the masters of the Superior and Addison, until levied upon by execution at the suit of the United States against Thomson, is not, per se, in law, a badge of fraud, which ought to invalidate or affect the title of the plaintiffs to these cargoes."
It appears to us that this decision is entirely correct in point of law, under the circumstances of the case.
Without undertaking to suggest whether, in any case, the want of possession of the thing sold constitutes, per se, a badge of fraud, or is only, prima facie, a presumption of fraud; a question, upon which much diversity of judgment has been expressed; it is sufficient to say, that in case even of an absolute sale of personal property, the want of such possession is not presumptive of fraud, if possession cannot, from the circumstances of the property, be within the power of the parties.
A familiar example of this doctrine is in the case of a sale of a ship, or goods at sea, where possession is dispensed with upon the plain ground of its impossibility; and it is sufficient if the vendee takes possession of the property, within a reasonable time after its return home. But in cases where the sale is not absolute, but conditional, the want of possession, if consistent with the stipulations of the parties, and, a fortiori, if flowing directly from them, has never been held, per se, a badge of fraud. The books are full of cases on this subject. The case of Bucknal vs. Royston, Prec. in Chan. 285, runs almost upon all fours with the present. The case of Sturtevent vs. Ballard, 9 John. 338, and Bissell vs. Hopkins, 3 Cowen, 166, contains strong illustrations of the principle; and being decisions in the very state, by whose laws the validity of the present agreement is to be tried, are of high authority. They sustain the doctrine asserted by the Circuit Court, in the most ample manner; and there is a learned note by the Reporter to the latter case, which embodies in an exact manner the principal authorities, English as well as American, on this subject. Now, in the case at bar, the goods at the time of the transfer were at sea, on a voyage, in which they were to be sold, or exchanged by the consignee, and the proceeds sent back in the same ships. It was therefore properly in the contemplation of the parties, and indeed a necessary result of their stipulations, that the *450 goods should not be intercepted, or taken possession of by the company, until the close of the voyage; and that the return shipments should conform to this arrangement.
There is no pretence to say, that the plaintiffs did not seek possession of the goods within a reasonable time after the arrival of the goods home. Their power to accomplish it was dislodged by the execution of the United States, and they obtained, as early as practicable, possession of the bills of lading and vouchers of their rights. But so far as the want of possession was matter of evidence presumptive of fraud, it was left open to the consideration of the jury; and the grievance now is, not that it was so left, but that the Court ought to have instructed the jury, as matter of law, that the want of possession, under the circumstances of the case, was, per se, a badge of fraud.
We have already expressed an opinion, that the Court were right in the instructions actually given.
Upon the whole we are of opinion, that the directions of the Court upon the merits of the cause at the trial, were correct in point of law; and that consequently there is no error in that part of the judgment.
It remains to consider, very briefly, certain exceptions taken to the testimony in the progress of the trial.
The first exception is, that the corporate capacity of the plaintiffs was not regularly proved, before the introduction of the respondentia bond. It is to be considered, that this was a trial upon the merits; and by pleading to the merits, the defendants necessarily admitted the capacity of the plaintiffs to sue. If he intended to take the exception, it should have been done by a plea in abatement, and his omission so to do, was a barrier of this objection. But, independently of this special ground, the very agreement in the case upon which the trial was had, as well as the admissions of the bond given to the United States, as security to refund the amount, if judgment should pass against the plaintiffs, was certainly, prima facie, evidence of an admission, on the part of the United States, of the corporate capacity of the plaintiffs, and to throw the burthen of proof on the other side.
The second exception was to the question put to Austin L. Sands, whether he was agent of the company.
We see no objection to this question. It was put in a form most unexceptionable; and it was a matter of subsequent inquiry, in what manner his agency was created; and it does not appear, from the nature of the question, whether it might not have been sufficient to establish that he was an agent, de facto, to receive the bond. It was indeed but an exception to the order of proofs, where several things are to be established to lead to a result; and in what order the inquiry is to be had, is *451 matter of discretion in the Court itself, and not of absolute right in the party.
The next exception is to the allowance of the bond to go to the jury, upon proof of its execution, by Thomson only.
It was a joint and several bond, and if executed by Thomson alone, it might be material to the plaintiffs' case. It was not introduced as general evidence, as to all the parties who were named in it; but only as to Thomson, and was connected with the title derived under him. Proof of the signature of Thomson, was, under the circumstances, prima facie evidence of his execution of the instrument.
The fourth, fifth, sixth, and seventh exceptions, turned altogether upon the question whether acts and proceedings of third persons, not in privity with the Insurance Company, nor known to them, were evidence against them? Most clearly they were not.
The eighth exception involves the point, whether the plaintiffs were bound to look to the application of the loan made by them. If not, the question asked was properly rejected. And we are of opinion, that the plaintiffs had nothing to do with the application of the money; and that when received by Thomson, he had a right to dispose of it in any manner he pleased.
Upon the whole, the judgment of the Circuit Court is to be affirmed with costs.
Mr. Justice JOHNSON.
I concur in the opinion delivered in this cause, and the rather, because I think it overturns the report of the decision in the case of Thelluson vs. Smith. It would be vain, to endeavour to reconcile this decision, with that, which is imputed to the case referred to.
This was nothing in its origin but a mortgage to the Atlantic Insurance Company; and a mortgage of a mere right, a metaphysical, transitory thing, over which the act of the party could not operate more immediately, or more forcibly, than a judgment upon land under the laws of Pennsylvania.
But I avail myself of this occasion, and I have long wished for an opportunity to put on record some remarks upon the report of the case of Thelluson vs. Smith. I have never acknowledged its authority in my Circuit, on the point supposed to be decided by it; to wit, the precedence of the debt of the United States, as to a previous judgment, in the case of a general assignment; and I propose now to show, what I think any one may see by a close inspection of the facts, even as stated in the report, to wit, that the question there supposed to be decided, really never was raised by the special verdict. It is true, it was argued, and no other question, judging from the report, *452 was argued. But, when the Court came to inspect the record, it must have seen that the special verdict did not raise the question, as between the parties to that suit. And, moreover, I find that the reporter has omitted one very material fact found in the special verdict; which was, that the United States had no interest in the issue, since their judgment had been voluntarily paid off by the assignees of Crammond the bankrupt. I copy the special verdict entered from the original roll, which I have inspected at the present term.
The jury found, "that on the 22d of May 1805, William Crammond of Philadelphia merchant, stood indebted to the United States in several bonds for duties, as follows:  (describing the bonds all of which were due after the date of the assignment.) On the respective bonds suits were brought, judgments entered, executions issued, and a sale made of a certain real estate called Sedgely, the property of William Crammond, and the proceeds thence arising came to the hands of the defendant John Smith marshal of Pennsylvania district, from whom it is claimed by the plaintiffs (who are) creditors of the said William Crammond on the following grounds:  A suit was instituted by the plaintiffs, in the Circuit Court of the United States for the district of Pennsylvania, against the said William Crammond, as of October Sessions 1802, and a judgment in the said suit, in favour of the plaintiffs, and against the said Crammond, was obtained for 32,253 dollars, on the 20th of May 1805. On the 22d of May 1805, the said William Crammond was insolvent, and had not sufficient property to pay all his debts. But his insolvency was not a matter of general notoriety. On the 22d day of the said month, the said William Crammond executed a general assignment of his estate and effects, bearing date the same day and year, and delivered it to the assignees therein named (prout assignment;) being on the said 22d of May, unable to satisfy all his debts. The moneys in the hands of the defendants, are claimed by the assignees under the said assignment, who have satisfied the United States the amount of the debts due the United States. If upon the whole matter," &c., in the usual alternative form of a special verdict.
Judgment below was rendered for defendant, and it is impossible it could have been otherwise; but not, as I conceive, upon the ground stated, since it is one which the verdict does not raise. It is true, the question was argued, but adjudications are not to have their effect from the questions argued, and the views taken by counsel in their points or briefs. There is a sensible rule laid down on this subject, in a book of grave authority, and the truth of which this Court has had occasion to verify not unfrequently; the purport of which is, that counsel ought not to "move any thing in arrest of judgment, except *453 the roll wherein the judgment is entered, or the postea, be in Court, 22 Cas. B.B., and the reason assigned is, that the Court may be satisfied that the matter moved in arrest of judgment is truly recited from the record; for the Court will not rely upon the allegation of counsel at the bar."
It often happens, after the most protracted discussions, that the Court differ from counsel in their views of the questions actually raised on the record, and on grounds which have not been argued.
In the case of Thelluson vs. Smith, I hold it to be incontrovertible, that the question of priority could not have been adjudicated upon, on the verdict, as set out in the record.
The special verdict does not give the date of the levy, and sale by the marshal, under the judgment by the United States; but as all Crammond's bonds to the United States fell due after the date of the assignment, it follows that the judgment, and necessarily all proceedings under it, were subsequent to the execution of that deed. The land levied on, therefore, had passed out of Crammond before the judgment of the United States was obtained, and of consequence the levy and sale under their execution, was a mere nullity. Could this furnish the ground of an action for money had and received by the Thellusons, in right of a judgment prior to the consignment, against Smith the marshal? It obviously could not. For as against the Thellusons' rights, whatever they were, nothing had passed. The purchaser of the lands at marshal's sale, who had received nothing for the money, might have brought such an action against the marshal; and the assignees might have sued for and recovered, the land; in which case it would have been held by them, as before, subject to Thelluson's judgment. But as between Thelluson and the marshal, there was no privity of action. And this was the true ground for rendering the judgment of this Court, in the suit against the marshal.
It is true the special verdict introduces the assignees into the cause, as claiming the money raised by the marshal, on the supposition, that after satisfying the United States, they succeeded to the priority of the United States. But suppose this recovery had been had against Smith, what was there to prevent the assignees from going on at law, to recover the land of the vendee? They were no parties to the record, and there is nothing in the pleadings, or the verdict, to show that they had intervened, or had a right to intervene in the name of the United States. They could not maintain a right to succeed to the United States, under the provisions of the 65th section of the Act of 1799, 3 vol. p. 197; because that right is extended only to sureties upon the bond. If they had acquired any right as against the Thellusons, it was a mere general equity, which *454 could only have been asserted in a Court of Equity. At law, in this indirect mode, it could not have been asserted, if it could have availed them at all.
I, at least, would have it understood that I concurred in the judgment in the case of Thelluson vs. Smith, on no other ground than the want of privity between the parties. Nor can I acknowledge it as authority to any other point; since the United States were satisfied, and the assignees could not be regarded in any view, at law, as succeeding to the priority of the United States, if the United States had priority; and since that priority could not come in question, in a case in which the sale of the land was a mere nullity; as is distinctly affirmed in the present decision, because the assignment divested all the interest of the insolvent, so as to place it beyond the action of the fieri facias, issuing on the judgment of the United States.
Judgment affirmed, with costs.