THE BRUNSWICK AND ALBANY RAILROAD COMPANY *et al.*, plaintiffs in error, *vs.* D. M. HUGHES, defendant in error.

1. Under the charter of the Brunswick and Florida Railroad, the directors were authorized to make all contracts binding on the company. By an act amending the charter, passed in 1838, it was enacted that "It shall be lawful for the board of directors to direct the president and secretary to issue bonds of said company, which shall be binding on the property of said company, and on such other property belonging to the stockholders as they may pledge to said company, by mortgage, to meet their own engagements or the engagements of the company:"

*Held,* that bonds issued by the company under such amended charter, without the execution of any mortgage to secure them, do not, *ipso facto,* become a lien upon the property of the corporation, so as to be superior, or even equal, in dignity to other bonds issued, under same authority, which are secured by a deed of trust, to certain trustees, in the nature of a mortgage.

2. Where a railroad company, with authority to issue bonds which should be binding upon its property, issued the same, and to secure them executed a deed of trust to certain trustees, with authority to the trustee, son a breach of the condition, to take possession and sell at public auction, as provided by law, the trustees may, when the conditions are broken as provided in the deed, take possession and sell without foreclosure before the courts, and if they proceed to sell by advertisement and sale, as is provided by law, in the case of mortgage executions, the sale will divest the title of the company.

3. Under the facts of this case, as they appear of record, the defendant in error was not entitled to any part of the proceeds of the sale of the railroad in the hands of the appointees of the court.

Corporations. Railroads. Liens. Mortgage. Trusts. Before Judge SCHLEY. Glynn county. At chambers. December 15th, 1873.

Reported in the opinion.

O. A. LOCHRANE; A. O. BACON; T. J. SIMMONS, for plaintiffs in error.

JACKSON, LAWTON & BASINGER, for defendant.

McCAY, Judge.

The parties to the record stand towards the fund in court, briefly, as follows: In January, 1856, the Brunswick and Florida Railroad issued the bonds of the defendant. Suit was brought on these bonds in 1868, and judgment had in 1871 against the Brunswick and Albany Railroad, the name having been changed in 1866, though this is not the company chartered by the act of 1869. In February, 1859, the company issued bonds to other parties. Both sets of bonds were issued under the act of December 27, 1838. To secure these latter bonds, the company made a deed of trust in the usual form, with a power to the trustees, on failure to pay and on notice, to take possession and sell "as provided by law." In 1868, failure having occurred, the trustees, by an attorney in fact, took possession, and after advertisement in a newspaper in Brunswick, (the locality of the principal office,) for the time prescribed by law for mortgage sale, sold the road and its franchises, at the usual place of public sales for Glynn county, during the usual hours, to the highest bidder. The purchasers procured a new charter, February 22d, 1869, reciting the fact of the mortgage, sale, purchase, etc., and giving them all the rights and franchises of the old company. The new company then proceeded to rebuild the road; none of it was in running order; only sixty-five miles graded, and that was without cross-ties or iron, and had laid thus eight or nine years. The new company issued the bonds to the plaintiff, securing them by a deed of trust. Failing to be paid, proceedings were had in chancery, the road sold, and the fund in court is the proceeds of that sale.

The act under which the defendant's bonds were issued by the old company in 1856, as well as the bonds issued in 1859, provided as follows: "That the bonds so issued shall be bind-

ing on the property of said company, and on such other prop-
erty belonging to the stockholders, as they may pledge to the
company by mortgage, to meet their own engagements, or the
engagements of said company." The defendant claims that as
his bonds were first issued, they, *ipso facto*, became a lien
on the property of the company; that the subsequent issue
of bonds, secured by a mortgage deed, did not affect or inter-
fere with it; that the subsequent sale under that deed of trust
did not disturb it, and that it extended to the new company—
the new road—and now attaches to the fund raised by the
sale under the decree, by which the trust mortgage of the
plaintiff was foreclosed, and the road directed to be sold, and
so the court below decided. The defendant's whole case, if
he has any, stands on the decision of this court in the case of
*Collins vs. The Central Bank et al.*, 1 *Kelly*, 435-458, and
again, 4 *Georgia*, 323-328. The question, then, was as follows:
The Monroe Railroad Company was authorized to bank and
to issue bills for circulation, and the act provided that the
"railroad to be built by said company, together with all the
revenues arising therefrom, and all the property, equipments
and effects therewith connected, shall be pledged and bound
for the redemption of the same." The road, having got into
trouble, suspended payment, and could not complete its road.
They contracted with Collins & Company to do this, and gave
them, by written contract, a lien on their road from Atlanta
to Macon. The road was sold by a decree in chancery under
a creditor's bill, and the proceeds came to be distributed, and
this court held that under the charter the billholders had a
lien above Collins & Company, as to all that portion of the
road built by the company before the date of the contract
with Collins & Company, but that Collins & Company had
a preferred lien arising from their equity as builders in all
the road they built. It is said that the language of these two
charters is similar, and that the cases are so analogous that
the decision in 1 *Kelly* controls this case. We do not think so.

1st. The case in 1 *Kelly* was the case of billholders, a
class of creditors whom it has always been the policy of the

law, for reasons connected with the currency of the country, specially to favor and protect, and it was in accord with that policy to give to the charter protecting them a liberal construction in their favor.

2d. The language of the charter of the Monroe Railroad was peculiar, the circumstances of its passage was peculiar, and it was hardly possible to give to the words of the charter a reasonable meaning, except the meaning given to it by the court. The power to issue bank-bills was a new grant— the franchise was of a different character from the original one, and the words used are, shall be "pledged and bound for the redemption."

3d. Bank-bills, under the laws of the State, constituted a debt known to the world. It was a matter of public record by the returns made to the executive department, what amount of bills of the bank were in circulation, and it was with a full, at least, constructive, knowledge of the indebtedness of the company to its billholders that Collins & Company made their contract of mortgage.

The case before us presents none of these features.

1st. The defendant's debt are ordinary bonds; they did not constitute the circulating medium of the state, and there is not, on any ground of public policy, any special reason for supposing that the legislature was specially anxious to protect them.

2d. Secret liens are dangerous and unjust, and it is only when some great public interest is involved that any construction of a law will be made asserting or upholding them : See Black vs. Scott, 2 Brock. Rep., 330, 346 ; Cunard vs. At. Insurance Co., 1 Peters, 386.

3d. The language of the charter of this company is not nearly so strong as was the language of the Monroe Railroad and Banking Company. The words there are " pledged and bound." The words here are simply " shall be binding." There is, besides, in this charter, other words indicating a reason for the use of the words other than the extraordinary meaning given to them by the argument of the defendant. It would seem that it was the intent to provide that certain

property of the stockholders mortgaged to the company should also be subject to the discharge of these bonds, and it is only a fair construction of the act, that whilst this mortgaged property was to be capable of being charged with this debt, it was not intended to discharge the company itself and its property.

4th. To my own mind, the great leading distinction between the two cases is the different nature and character of the debts. The one—that of these defendants—an ordinary debt, contracted for the loan of money, contracted and issued in secret, held and kept in secret, perhaps in a foreign country. The other, the debt protected by this court in the case of the Monroe Railroad bank bills, issued under the authority of the legislature for circulation among our own people, to be taken by the rich and the poor, to form a part of the currency of the state, affecting its vital interests, going into the public coffers, upon the safety and security of which the peace and prosperity of the country depended, the amount of which everybody might know, as it was required by law to be reported to the governor, under the oath of the president and cashier, (act of December, 1832, Prince's Digest, 49,) and "published in as many of the public gazettes as the governor may deem necessary to secure a general circulation of the said reports:" Act Dec. 24th, 1832, Prince's Dig., 50. It seems to us that language, in reference to the character of such debts and their relation to other debts, is to have a far more liberal and exclusive signification than even the same language in other laws relating to debts, clothed with none of the attributes and having none of the relations to the public of bills and notes for circulation. Indeed, by the Code, section 1487, paragraph 2, in the case of insolvent banks, the billholders are, by the general law, entitled to preference. It is inconceivable that the legislature should have meant, by the amendment to the charter of December 27, 1838, to set such a trap for the people of the state as the construction contended for would provide; to authorize a private company, having and expecting to have a large visible estate, secretly to contract debts by the issue of bonds, to give no notice of

the issue, and to make said bonds a preferred lien as against other honest creditors, contracting fairly without notice of the lien.   We cannot think it, and we would struggle far more to construe the act against such a meaning than it is necessary to do in this case.   Our judgment is that it was the clear intent of the company, in making the trust deed, to authorize a sale, on a failure to pay without any legal proceedings before the courts.   Such is the plain language of the deed.   The trustees are authorized to take possession and to sell as "provided by law."   Clearly, this means according to the law of public sales, and that was pursued to the letter.   As to the charges of fraud in the sale, it does not appear that the purchasers partook in or were aware of it, much less does it appear that the present plaintiffs, who are also purchasers (mortgagees) from these purchasers, had any part, or lot, or notice of any fraud.   The view of the rights of the parties which we have discussed makes it unnecessary to go into the other questions made on the argument, and we reverse the judgment.

Judgment reversed.