WALTERS et al. v. WESTERN & A. R. CO. et al. (CAPITAL CITY BANK, Intervener).

(Circuit Court of Appeals, Fifth Circuit. December 18, 1894.)

No. 245.

BILL OF LADING—NEGOTIABILITY—PLEDGE.

E. & Co. were grain brokers in the city of A. Persons from whom they bought grain drew at sight on E. & Co. for the price, and forwarded the drafts for collection, with the bills of lading of the grain attached. E. & Co. arranged with the C. Bank to take up these drafts, and hold them as demand notes against E. & Co., with the bills of lading as security. E. & Co. claimed no control over or right to the bills of lading until they should take them up from the C. Bank. *Held* that, though the payment of the drafts by the C. Bank extinguished them as commercial paper, the bills of lading did not thereby become the property of E. & Co., but the bank became the lawful holder thereof, and entitled to receive from the carrier the goods represented by such bills of lading,—at least, to the extent of the amounts paid on the drafts, with interest.

Appeal from the Circuit Court of the United States for the Northern District of Georgia.

This was a suit by William T. Walters and others against the Western & Atlantic Railroad Company, in which receivers of the

defendant's property were appointed. The Capital City Bank intervened, seeking payment of a claim against the railroad company. The matter was referred to a special master, who reported in favor of the bank. Exceptions to this report were overruled (63 Fed. 391), and, from the decree overruling same, complainants appeal.

Julius L. Brown and B. F. Abbott, for appellants.
John C. Reed, for appellees.

Before PARDEE and McCORMICK, Circuit Judges, and BRUCE, District Judge.

PARDEE, Circuit Judge. The record in this case shows that the appellee the Capital City Bank asserts a claim against the Western & Atlantic Railroad Company, apparently in liquidation, for the value of 18 certain car loads of grain, for which the Capital City Bank holds unsatisfied bills of lading, the railroad company having failed to deliver the said grain on demand. The case appears to have been referred in the circuit court to a special master, who took the evidence, and reported in favor of the Capital City Bank. Exceptions were filed to the report, and the whole matter—the evidence, report, and exceptions—was submitted, whereupon the circuit court gave a decree in favor of the Capital City Bank, and against the Western & Atlantic Railroad Company, for $7,602.84, with interest from September 9, 1893, the same to be paid out of the funds of the said company in the hands of receivers of the court. From this decree Walters and others, complainants in the main case, appealed to this court.

The circumstances under which the claim of the Capital City Bank arises, as we gather from the evidence, are as follows: In the fall and winter of 1889 the Western & Atlantic Railroad Company, a corporation chartered by the state of Georgia, operated a railroad, the eastern terminus of which was Atlanta, Ga.; the Capital City Bank was a corporation doing a banking business in the city of Atlanta; George B. Everett & Co. were brokers dealing in grain, and having their office in the city of Atlanta, Ga.; and Akers & Bros. were a partnership doing a milling business at McIvors station, a short distance out of Atlanta, on the line of the Western & Atlantic Railroad. Akers & Bros. were customers of Everett & Co., and through them, as brokers, from time to time, procured grain for milling purposes, to be delivered at McIvors station; Everett & Co., in turn, ordering the same from western shippers. In the months of October and November, 1889, certain shippers of grain, outside of the state of Georgia, shipped to various points, for carriage by the Western & Atlantic Railroad Company, among others, certain 18 cars loaded with grain consigned to special order, receiving, at the time of shipment, bills of lading particularly describing the cars and contents, and reciting that the goods were consigned to special order. Some of the bills of lading were marked, "Notify Everett & Co., Atlanta, Ga." Others were silent as to the notification of any party. On receiving the bill of lading, each

shipper indorsed the same in blank, and, attaching thereto a sight draft drawn on Everett & Co. for the price of the grain, forwarded the same through the banks for collection. At the time of shipping the grain, an invoice giving the date of shipment, the contents, and number of the car containing the same, was forwarded by the shipper to Everett & Co. On receipt of this invoice, Everett & Co. delivered to Akers & Bros. an invoice of their own, showing car, number, and contents, marking the same "Paid"; at the same time receiving from Akers & Bros. an obligation in writing, of which the following is a sample:

"$542.26 due.                                Atlanta, Ga., Oct. 26th, 1889.
   "Forty-eight days after date, we will pay to G. B. Everett & Co., on presentation of bills of lading for cars 18 and 12,624, five hundred and forty-two and $26/100$ dollars.
   "Net ——. Int. ——.                                Akers & Bros."

When the drafts drawn by the shippers on Everett & Co., with bills of lading attached, reached Atlanta, the Capital City Bank, under an arrangement with Everett & Co., advanced the money to pay the same, and, by agreement, held the drafts as demand notes against Everett & Co., and retained the bills of lading as security for the same. In relation to these matters, Mr. Everett testifies, and his evidence is undisputed:

"Our shipments were made to McIvors, a station of the W. & A. Railroad, some twenty miles north of here. * * * We had no way of determining the arrival of the goods there. There is no telegraph station there, or post office there; and, in selling Akers & Bros. wheat and grain to be delivered at their mills, we had to take their word for the arrival of goods. And they would put us off from time to time, saying cars were not there,—hadn't yet arrived; and as we had to take care of all the drafts drawn on the grain, promptly, we adopted this plan of making him give us a contract for each car, stating the limit to which we would allow,—the limit of time we would allow for it to arrive, and for him to pay us for it in some way or other. These contracts were usually made. We made him an invoice as soon as we received the invoices from the eastern shipper that gave him notice of the car number, so that when the car arrived he would know who shipped, and so on, and the contents, and quality of the grain. Q. What would be the final result? A. When this time expired, or if he wanted to use these cars mentioned,—the grain mentioned in one of these bills before, either one of them,—he would invariably communicate with us, in Atlanta, to get the bills of lading; and he would give us a check or a plain ordinary note for the same, which we would use in our business, and surrender to him the bill of lading, and then this was destroyed. Q. Well, now, how did you get the bill of lading yourself, when the draft was attached? A. I would have to give a check,—my check,—and pay the draft, or take the money. Q. Now, these bills of lading represented by these papers here,—did you ever get them? A. Never have had them; never have owned them; never. Q. Why not? A. Because Akers & Bros. never have paid me for them,—never have called on me for the bills of lading. In other words, never notified me that they arrived. Q. Why didn't you get the bills of lading? You have never paid for these yourself? A. No, sir; I have never owned them,—never have paid for them. * * * Q. Mr. Everett, what control, if any, did you ever attempt to exercise over these papers in evidence here? A. None whatever, except to try to direct to which bank they should be sent for collection. Q. You have never conceived you had any right to them, then? A. Never. Those bills of lading were treated in the same manner as we are doing business to-day with both the Capital City Bank and Lowry's Bank. They hold them, and they are their property."

On December 13, 1889, Akers & Bros. failed, at which time the Capital City Bank held bills of lading to secure drafts drawn on Everett & Co. for 36 car loads of grain, all of which, after shipment in due course of carriage, came to the possession and control of the Western & Atlantic Railroad Company. With the failure of Akers & Bros., the railroad agency at McIvors station was discontinued, and such cars as were lying at McIvors station, awaiting delivery, were brought into Atlanta. Soon after the failure of Akers & Bros. the Capital City Bank made demand upon the Western & Atlantic Railroad Company for the delivery of the 36 car loads of grain for which the bank held bills of lading. This demand was made upon the general freight agent of the railroad company. The general freight agent answered the demand by causing an investigation to be made, on which investigation it was found that 18 of the 36 cars for which the Capital City Bank held bills of lading had been at various dates, and in the months of October, November, and December, delivered by the agent of the company at McIvors station to Akers & Bros.; the other remaining 18 cars were still in the possession of the railroad company, and were delivered to the Capital City Bank, under the demand made to the general freight agent. On the day of their failure, Akers & Bros. gave a mortgage to the Western & Atlantic Railroad Company, which recited the following purpose:

"Said Western & Atlantic Railroad Company has heretofore delivered to us, at different times, shipments of corn, wheat, oats, and flour, which were consigned to us by various persons; said deliveries being made without requiring the production of the bills of lading or railroad receipts for or connected with such shipments, and certain of such bills of lading and receipts are now outstanding, in the hands of persons who claim that said company is liable to them for making such deliveries, and this conveyance is made to secure said company, and hold it harmless from loss on account of such claim."

About nine months after the failure of Akers & Bros., on October 17, 1892, G. B. Everett, one of the firm of Everett & Co., by his individual note and a deposit of collateral security, secured the Capital City Bank from loss in case the Capital City Bank should fail to recover from the Western & Atlantic Railroad Company the value of the grain covered by the several bills of lading involved in this case. We find no evidence in the record showing, or tending to show, that either the Western & Atlantic Railroad Company or the Capital City Bank had any knowledge of the invoices given by Everett & Co. to Akers & Bros., or of the obligations given by Akers & Bros. to Everett & Co.

On the facts of the case, as recited, the first inquiry to which our attention is directed is as to the title acquired by the Capital City Bank to the bills of lading, and the goods represented by them, when the bank advanced the money to pay off the sight drafts under the agreement with Everett & Co. that the bank should hold the same as demand notes against Everett & Co., and retain the bills of lading as collateral security thereto. Unquestionably, if Everett & Co. had themselves paid the sight drafts, they would thereby have become the lawful holders of the bills of lading, and

have been entitled to demand the contents from the railroad company; and it seems also unquestionable that Everett & Co. could have borrowed an equal amount of money of the bank, and made lawful delivery of the bills of lading, with the consequent right to demand the goods represented thereby as collateral security. No suggestion is made as to any illegality in the transaction by which Everett & Co. procured the bank to pay off the drafts on security of the bills of lading, nor is any suggestion made that thereby a complete contract was not made and executed between Everett & Co. and the bank.

The contention of the appellants, as we understand it, is that as the sight drafts, with bills of lading as collateral, were forwarded to the Atlanta banks for collection, there was no authority in the banks at Atlanta to negotiate the drafts, or make any other use of them than to collect the money, and when the money was collected, no matter from whom, the sight drafts were fully accomplished, and, ex necessitate, the bills of lading belonged to Everett & Co.; in other words, that Everett & Co. became the owners and holders of the bills of lading, and entitled to demand from the railroad company the goods represented by such bills just as soon as the sight drafts were paid off, no matter by whose procurement. It may be, and probably is, the law that when the sight drafts were forwarded to the Atlanta banks for collection, and the Capital City Bank advanced the money to pay them, and did pay them, that thereby the sight drafts, as commercial paper, were dead obligations; but we do not think it follows that the bills of lading were thereby accomplished, or that necessarily thereby Everett & Co. became the holders of them, with power of disposal. It rather appears to us that Everett & Co., having the right to pay off the original sight drafts, and thereby become the holders of the bills of lading, had full power to substitute the Capital City Bank to such right. The amended Code of Georgia permits the pledge of goods by the delivery of bills of lading as symbolic of the property pledged. Act Oct. 3, 1887 (Laws Ga. 1887, p. 36). The commercial law, as recognized and declared by the supreme court of the United States, is to the effect that where goods are received by a common carrier for shipment, and a receipt or bill of lading is given therefor, in which it is stipulated that the goods at destination shall be delivered to the order of the consignor, such receipt or bill of lading attached to a draft operates a pledge of the goods mentioned in the receipt or bill of lading as security for the payment of the draft, and that the carrier cannot, except at its peril, deliver the goods represented by such receipt or bill of lading, except upon the production thereof, and the order of the consignor. North Pennsylvania R. Co. v. Commercial Nat. Bank of Chicago, 123 U. S. 727, 8 Sup. Ct. 266. To the same purport, see Boatmen's Sav. Bank v. Western & A. R. Co., 81 Ga. 221, 7 S. E. 125. We therefore find, upon the facts of this case, that the Capital City Bank, under the contract with Everett & Co., in pursuance of which the bank paid the sight drafts to which the bills of lading in controversy were attached, became the lawful holder of said bills

of lading, and, as such, entitled to have and receive from the railroad company the contents represented thereby, at least to the extent of fully paying the sum or sums called for by the sight drafts paid off, and lawful interest thereon. And, finding this to be the case, we are, of necessity, compelled to hold that Everett & Co. never acquired the title to the bills of lading, or the grain represented thereby, and therefore it is immaterial to inquire into the nature of the transactions between Everett & Co. and Akers & Bros. The facts, as recited, however, seem to show clearly that, as between those parties, it never was contemplated by either that Akers & Bros. were to become the holders of, and entitled to, any bills of lading prior to paying for the same in the usual course of business, all as testified to by Mr. Everett.

Some question is made by the appellants that, although the Capital City Bank was the lawful holder of the bills of lading, and entitled to demand delivery, yet delivery was not demanded, prior to the suit, of the proper agent of the company. We find in the record a detailed statement of the several agents of the Western & Atlantic Railroad Company, and of their respective duties; but we also find, in this case, that the local agent at McIvors station, who was one of the firm of Akers & Bros., was removed, or otherwise disappeared, as agent at that station, and his place was not supplied. In the absence of the local agent, we are of opinion that a demand upon any agent of the company in general control was sufficient, and that as demand was actually made upon the general freight agent, who, it seems, represented the company so far as the cars in question were on hand, and who made regular delivery of the same, the railroad company ought not to deny his authority.

Stress is also laid by appellants upon the fact that, nine months after the Western & Atlantic Railroad Company made default, George B. Everett, one of the firm of Everett & Co., by his individual obligations, secured the Capital City Bank from loss in the premises; but we are disposed to treat this as cutting no more figure than the fact that on the very day of the failure of Akers & Bros. the Western & Atlantic Railroad Company protected itself, so far as it was able, by mortgage and other security, from loss or damage occasioned by improper delivery of cars of grain, etc., to Akers & Bros. In disposing of this case in the circuit court, the learned judge presiding says:

"The whole question comes back to this: that the railroad company should have required the bills of lading to be given up before delivering the goods, and when they allowed Akers & Bros. to receive these goods without, at the same time, receiving from them the bills of lading, they did so in violation of the rights of this intervener, who seems, in the utmost good faith, to have advanced the money upon the credit of the goods covered by the bills of lading,—of their being in possession of the railroad company. While it is conceded that bills of lading are not negotiable instruments, in the full sense of that term, still they do represent the goods which they cover, and may be taken as security for money advanced while the consignment is in the hands of the railroad company. Among the cases which might be referred to, the following are named, because they are supreme court decisions, and the doctrine they enunciate controlling: Conard v. Insurance Co., 1 Pet.

386; The Thames, 14 Wall. 107, and cases therein cited. It is apparent that the bank would have been fully protected if the railroad company had required the bills of lading to be delivered, or had exercised any reasonable degree of diligence in ascertaining the person entitled to receive the goods, before releasing possession."

This view of the case is correct, and the decree appealed from is affirmed, with costs.