JOHN CONARD, MARSHAL OF THE EASTERN DISTRICT OF PENNSYL-
VANIA, PLAINTIFF IN ERROR *vs.* FRANCIS H. NICOLL, DEFEND-
ANT IN ERROR.

The principles decided in the case of Conard *vs.* The Atlantic Insurance Com-
pany, relative to the priority of the United States, examined and confirmed(*a*).

ERROR to the circuit court of the eastern district of
Pennsylvania.

The defendant in error brought an action of trespass, in
the court below, against the plaintiff in error, for a quantity
of merchandize, consisting of teas, cassia, nankeens, &c. all
of the value of one hundred and ninety-three thousand seven
hundred and twenty-five dollars. Also for four ships, viz. the
Addison, the Woodrop Sims, the Thomas Scattergood, and
the Benjamin Rush, all of the value of one hundred thou-
sand dollars.

The defendant below pleaded, that he, as marshal of the
district of Pennsylvania, had a writ of fieri facias against one
Edward Thomson, in favour of the United States, and that
he seized the merchandize and ships as Thomson's property.
The plaintiff replied, property in himself, &c. in the common
form.

It was agreed between the parties to the suit, that the title
of Francis H. Nicoll to the property should be tried, the
property having been placed in the hands of trustees, to
abide the event of the suit.

The case was tried in the circuit court, before Mr Justice
Washington, and a verdict was given for the plaintiff for
thirty-nine thousand two hundred and forty-nine dollars and
sixty-six cents damages. The defendant in the circuit court
excepted to the charge of the court, and prosecuted this writ
of error. The whole charge delivered to the jury in the
circuit court, was brought up by the writ of error.

By direction of the court, the whole of the charge deliv-
ered by Mr Justice Washington in the circuit court is inser-
ted, as follows:

(*a*) 1 Peters, 386

[Conard *vs.* Nicoll.]

This is an action of trespass brought against the marshal of this district, for levying an execution at the suit of the United States against Edward Thomson, on the ships Addison, Woodrop Sims, Benjamin Rush, and Thomas Scattergood, and certain parts of their cargoes, alleged to have been the property of the plaintiff. The defendant justifies his proceedings under the allegation that the property levied upon belonged to Edward Thomson, against whom the execution was sued out.

The evidence given by the plaintiff to prove his title to the property in dispute, is substantially as follows: a respondentia bond in the usual form, dated in April 1825, on a certain part of the outward cargo of the ship Addison, with a memorandum annexed, reciting an agreement, that the outward bill of lading should be indorsed to the plaintiff, as a collateral security for the sum mentioned in the bond, and that the property to be shipped homeward, being the proceeds of the outward cargo, should be for account and risk of Edward Thomson, but to be consigned to order, and the bill of lading for the same to be forwarded to the plaintiff.

2. The bill of lading of the outward cargo, referred to on the bond and memorandum, for account and risk of Edward Thomson, indorsed by him in blank, and delivered to the plaintiff.

3. A homeward bill of lading and invoice for account and risk of Edward Thomson, consigned to order, and indorsed by the shipper at Canton, dated in November 1825; which, upon the arrival of the ship in the spring of 1826, were delivered by Peter Mackie, the head clerk of Edward Thomson, before his failure, and afterwards one of his general assignees, to the plaintiff.

The title to the cargoes of the other ships is in all material respects the same with that just stated.

The title to the ships themselves is claimed under bills of sale by Edward Thomson to the plaintiff, dated on the 9th of July and 27th of October 1825.

On the 19th of November 1825, Edward Thomson made a general assignment of all his estate to Peter Mackie and Richard Renshaw, for the benefit of his creditors.

[Conard *vs*. Nicoll.]

The United States having obtained judgments against Edward Thomson to an immense amount, sued out and levied executions on these ships and their cargoes, at the moment of their respective arrivals in the spring and autumn of 1826.

In October 1826, the whole of this property was restored by the United States to the plaintiff, under an agreement between them that it should be without prejudice to any existing right, and that the plaintiff should sell the same to the best advantage, and should immediately invest the net proceeds, in the name of the secretary of the treasury, in productive stock, and place the certificates thereof in the bank of the United States, &c.; and that the plaintiff should institute a suit against the marshal, to ascertain the right to the said proceeds; in which action, if the plaintiff in his own right, or as representing Smith and Nicoll, should establish his right thereto, then that the said proceeds should be paid to him; otherwise, the same to be paid to the United States. This agreement is recited in the condition of a bond executed by the plaintiff, with sureties to the United States.

An agreement had been previously entered into by the counsel in the cause, dated the 27th of September 1826, stipulating, that the merits only should be litigated, without regard to form.

In the case of the Atlantic Insurance Company *vs*. Conard, a great variety of objections of a legal character to the title of the plaintiff in that cause, which are equally applicable to that of this plaintiff, were stated and overruled by the supreme court, and they have of course been abandoned by the defendant's counsel in this cause. They rely nevertheless upon other objections, partly legal, but mainly resting upon the particular facts belonging to this case, and which are now to be examined. The duty of the court will be to give to the jury an opinion upon every question of a legal nature which the case presents; and after laying down certain general principles of law applicable to the evidence which has been given, to leave the facts to be decided by the jury.

The first objection to the plaintiff's title is, that the trans-

fers executed by Edward Thomson to the plaintiff, for the property in dispute,.were given without consideration. It is denied that any thing, much less the amount stated in those transfers, was due by Edward Thomson to the plaintiff, or to Smith and Nicoll, at the time they were executed. Upon this point, it is proper that the jury should be satisfied; and it is for them to decide upon the evidence, whether these securities were given for value received or not; if they were given without consideration, the plaintiff will have failed in establishing his right to the property; which they professed to transfer.

The plaintiff relies upon the following evidence to prove the consideration for which those securities were given. 1. The respondentia bonds and memorandum annexed, both under seal, and both of them acknowledging a loan to Edward Thomson of the sum expressed in them.

2. The negotiable notes of Edward Thomson to the plaintiff, or to Smith and Nicoll; produced in evidence by the plaintiff.

3. A settled account, signed by Mackie, on the part of Edward Thomson, and by Mr Worthington on that of the Nicolls.

4. Sundry entries in Edward Thomson's memorandum book.

The correspondence between the Nicolls and Edward Thomson is relied upon by the plaintiff as additional proof of the fact; and by the defendant's counsel, for the purpose of disproving it.

Upon this evidence the court has only to observe, 1. That even bills of exchange and negotiable notes of hand are prima facie evidence of value received, as well between the original parties, as third persons, so as to throw upon the party who denies the fact the burthen of disproving it(*a*). The presumption is certainly not less strong where the acknowledgement of value received is under the seal of the party. If this be the settled law, as the authorities cited prove it to be, it is not competent to the defendant to shift the burthen of proof by giving notice to the plaintiff that

(*a*) Mandeville *vs.* Welch, 5 Wheat. 282    Riddle *vs.* Mandeville, 5 Cranch, 322.  Chitty on Bills, note 17

[Conard *vs.* Nicoll.]

he would be required on the trial to prove that the securities under consideration were given for value received.

2. That a settled account between a creditor and his debtor being proved, is prima facie evidence of the balance stated on it having been due; which may nevertheless be impeached and disproved by pointing out errors in the account, and maintaining their existence.

It is insisted, however, by the defendant's counsel, that the consideration for these securities, admitting it to be proved, flowed from Smith and Nicoll, and that the plaintiff has given no evidence of an assignment by them to him. But, without noticing the agreement between the plaintiff and the United States as to the interest of Smith and Nicoll, represented by the plaintiff; it may be observed, that if the Nicolls and Edward Thomson were contented, and so agreed, that these securities should be given to the plaintiff for debts originally due by Edward Thomson to Smith and Nicoll, it cannot be essential to the plaintiff's recovery in this case, that he should produce a written assignment by Smith and Nicoll to him. If the plaintiff, as between himself and Smith and Nicoll, be not entitled beneficially to the property in dispute, or to its proceeds, that is a matter to be settled between them, and can form no question in this cause. That Edward Thomson assented to this arrangement is proved, prima facie, at least, by the securities themselves; and the objection relied upon cannot with propriety be urged by the United States, who claim the property in dispute as belonging to him.

The second objection to the plaintiff's title, and the one mainly relied upon, is, that the transactions between the plaintiff, and Smith and Nicoll, and Edward Thomson, upon which the transfers of the property in dispute were founded, were, as they respected the United States, fraudulent and void. Whether they were so or not, will be submitted to the decision of the jury upon the evidence which has been given, after the court has stated some general principles of law to assist them in their investigation.

The first inquiry is, What is fraud? From a view of all that has been said by learned judges and jurists upon this

[Conard *vs.* Nicoll.]

subject, it may be safely laid down, that, to constitute actual fraud between two or more persons to the prejudice of a third, *contrivance and design*, to injure such third person, by depriving him of some right or otherwise impairing it, must be shown. In the case of Chesterfield *vs.* Jansen(*a*), Lord Hardwicke terms it dolus malus. Lord Coke defines covin, to be a secret assent determined in the hearts of two or more, to the defrauding and prejudice of another(*b*). The acts of 13th Eliz. ch. 5, and 27th Eliz. ch. 4, which did little more than affirm the doctrines of the common law, afford substantially the same definition. The case stated by lord Mansfield, in Worsley, &c. *vs.* Demattos, &c.(*c*), of a person, who, knowing that a creditor has obtained judgment against his debtor, buys the debtor's goods, though for a full price, with a view to defeat the execution of the creditor, is a strong illustration of the same principle; the purchase was declared to be fraudulent, not because a man may not lawfully purchase the property of a defendant against whom there is a judgment, but because of the intention with which it was made.

The question then for you to decide will be, whether the transactions between these parties, which are alleged to have been fraudulent, were contrived or intended to delay or defeat the United States of the debts due to them by Edward Thomson, or otherwise to prejudice their rights. How far the Nicolls might lawfully take care of their own interests, although by doing so the United States might thereby be prejudiced, will be seen when we come to consider more particularly the alleged instances of fraud which have been relied upon. But previous to this examination it may be proper to lay down the following principles, which seem to be incontrovertible.

1. That actual fraud is not to be presumed, but ought to be proved by the party who alleges it.

2. If the motive and design of an act may be traced to an honest and legitimate source, equally as to a corrupt one,

(*a*) 2 Ves. 155.
(*b*) Co. Lit. 357, c.
(*c*) 1 Bur. 474. See also Cadogan *vs.* Kennet, Cowp. 434.

[Conard vs Nicoll.]

the former ought to be preferred. This is but a corollary to the preceding principle.

3. If the person against whom fraud is alleged, should be proved to have been guilty of it in any number of instances; still if the particular act sought to be avoided be not shown to be tainted with fraud, it cannot be affected by those other frauds, unless in some way or other it be connected with or form a part of them.

It may be proper in this place to observe, in relation to the frauds alleged to have been committed by Bailey and Edward Thomson, to the prejudice of the United States; that they cannot affect the rights of the plaintiff or of Smith and Nicoll, unless it be proved to your satisfaction that Bailey was at the time he committed them the general agent of those parties, or that he committed them in some transaction within the scope of a special agency, and in connexion with or otherwise affecting these securities.

The first instance of alleged fraud, by the plaintiff, or by Smith and Nicoll, is the taking of these securities from a man known by those persons to be a debtor to the United States, and believed by them to be in a state of insolvency.

But this is not a fraud even in England, unless the security be given in contemplation or on the eve of bankruptcy, and unless the assignment or transfer in favour of such preferred creditor or creditors, exhaust the whole estate of the debtor, or approach so near as that the exception is merely colourable(a). But in a case where the bankrupt law does not apply, there can be no doubt that a debtor may lawfully give a preference to a particular creditor or set of creditors; if there be a delivery of possession where it can be done, although his other creditors may thereby be hindered or delayed in payment of their debts. The case of Holbird vs. Anderson(b) is a strong case in support of this principle. How far the right of preference of the United States can be affected by an assignment of their debtor for the benefit of his creditors, will be considered under another head.

(a) 1 Bur. 478—481.
(b) 5 Tr. Rep. 235. See also 8 Tr. Rep. 521.

[Conard vs. Nicoll.]

The other instances of alleged fraud are—

2. Alteration in the form of the memorandum to the respondentia bonds, thereby making the homeward cargoes deliverable to order.

3. Taking bills of sales of Edward Thomson's vessels, by the plaintiff or by Smith and Nicoll; surrendering them on arrival of the vessels, and then taking new ones; practised by those persons, in repeated instances, prior to the year 1825.

4. Having on board these vessels on their arrival double papers; that is to say, a general bill of lading of the whole homeward cargo, and also several bills of lading of the parts covered by the respondentia bonds and outward bills of lading.

5. Upholding the credit of Edward Thomson by the Nicolls; although the desperate state of his affairs was known to them.

6. Antedating the respondentia bonds to make them conform to the outward bills of lading.

7. Want of possession of the vessels and cargoes covered by the plaintiff's securities.

Lastly, the persuasions used by the Nicolls, to induce Edward Thomson to trade on the credit for duties allowed by the United States.

It may be sufficient for the present to observe, generally, that these acts, nor either of them, although they should be proved to the satisfaction of the jury, are or is, *per se*, fraudulent. This, it is believed, may be satisfactorily shown by a more particular consideration of these acts of alleged fraud.

1. As to the alteration in the form of the memorandum : it will be sufficient to observe that no principle of law has been referred to, or case cited, to countenance this objection. It would on the contrary seem to have been strictly correct to make the alteration in a case where the outward and homeward cargoes were transferred, not absolutely, but merely as collateral security, if the debt for which they were pledged should not be paid on the arrival of the vessel, or be otherwise secured according to the stipulations of the bond.

2. As to the practice of the plaintiff and of Smith and Nicoll prior to the year 1825, in surrendering the bills of sale

which they had obtained of Edward Thomson's vessels upon their arrival, and then renewing them as soon as those vessels had been entered; should it be admitted, (which I am not to be understood as admitting), to have been fraudulent as it concerned the United States; it is not easy to perceive how it can be made to infect with fraud the bills of sale made to the plaintiff in July and October 1825; which never were surrendered, but on the contrary were used as the foundation of the plaintiff's claim to the possession of the vessels, which they respectively conveyed immediately on their arrival in 1826. If there has been any evidence given to connect these transactions together, so as to bring them within the operation of one of the principles before mentioned, the jury will judge of it.

3. As to the double papers on board of these vessels: the question is, were they contrived with a view to defraud the United States of the duties on the cargoes of those vessels, or may not a legitimate purpose for the use of them be fairly presumed? Let it always be kept in mind, that these cargoes were not sold to the plaintiff, but were merely pledged as collateral security. If on their arrival they were redeemed, they would then become the absolute property of Edward Thomson; who would be absolved from his obligation to deliver the particular bills of lading to the plaintiff, and be entitled to enter them as owner under the general bill of lading. If they were not redeemed, then the plaintiff would enter them as the owner of the bills of lading to order, and which by the agreement were to be delivered to him. There would seem therefore to have been a fitness to this state of things in the arrangement now complained of.

4. That a false representation by one person of the credit of another, by which a third person is deceived and injured, is a fraud upon the parties so deceived, is undeniable. A letter of credit, giving to the person in whose favour it is written a character for solidity, which the writer knows to be untrue, is of this description. But to uphold the credit of a merchant by advances to any amount made by his friends, or by his creditors, for the purpose of preventing his failure, and of enabling him to go on, under the expectation that he

may thereby acquire the means of discharging his debts, and of maintaining a standing in the commercial world; has never yet been decided, by any English or American court, to be a fraud upon any third person, who, misled by appearances, may have dealt with and given credit to the person so assisted. No case resembling it has been produced or alluded to. There is, in fact, an absence of that kind of suggestio falsi, or suppressio veri, which the law considers as amounting to actual or even constructive fraud.

It is insisted that the conduct of the Nicolls, in this particular, was a contrivance to give a false credit to Edward Thomson at the customhouse, for the purpose of enabling him to defraud the United States of their duties on the goods entered in his name. But is this likely? If the customhouse officers were faithful to the duties which the law imposed upon them, and which they had solemnly engaged to perform; how was it possible that the United States could be defrauded, or in any manner prejudiced by such a contrivance? Their duty was to retain the custody of the teas under their own lock and key until the duties were paid, or such security given as should be entirely satisfactory to them. Could it have entered into the minds of any persons, that officers so bound and so confided in by their country, could so far betray their trust, as to open the doors of their warehouses to Edward Thomson, to take out teas whenever and to whatever amount he pleased without permits, and without paying or securing the duties upon them; by giving solid and satisfactory sureties to pay them when they should become due? It is the sufficiency of the sureties, and not that of the principal, that the law looks to. I am not to be understood as saying that the conspiracy or contrivance imputed to these parties was not or could not have been in their contemplation. But when we are upon the subject of motives and intention, the improbability of their existence deserves consideration. If, indeed, the illegal abduction of the teas, with the anticipated and known connivance of the customhouse officers, formed a part of the contrivance, a case of fraud would be made out; and it will be for the jury to decide whether the participation of the plaintiff, or of Smith and

[Conard *vs*. Nicoll.]

Nicoll, in those disgraceful transactions, is made out by the evidence in the cause.

5. I pass over the next objection, with this single observation; that the indorsement of the outward bills of lading to the plaintiff for a full consideration, (if it should be the opinion of the jury that such was the fact), transferred to him the property mentioned in them; and if the bonds with the memorandum annexed were agreed by the parties to form parts of the securities to be given to the plaintiff, there was no impropriety, much less fraud, in antedating the latter so as to make them conform to the former.

6. The objection, that possession of the ships and their cargoes was not delivered at the time they were transferred, was so fully refuted by the supreme court, in the case of Conard *vs*. The Atlantic Insurance Company; that it would be a waste of time for this court to notice it further than by observing, that the outward cargoes and their proceeds were mortgaged, not conveyed absolutely to the plaintiff; that the ships were at or beyond sea, at the time they were conveyed; and that possession of them was demanded and refused by the officers of the United States as soon as they arrived. These facts are not disputed, and the legal result is, that under these circumstances the want of possession is not a badge of fraud.

7. The last instance of fraud relied upon by the defendant's counsel is, that Edward Thomson was induced by the Nicolls, contrary to his own wishes, to trade upon the credit for the duties allowed him by the United States, instead of holding his funds in order to discharge those duties when they should become payable.

To this objection it has been asked, and it seems to the court with great propriety, for what other purpose was the extended credit of two years given, but to enable the owner of teas in store, or on bond, to trade on his capital in the mean time? If it was a fraud in him to employ his capital otherwise than in retaining it to meet the claim of the United States at the expiration of the two years, it is difficult to perceive the advantage which the credit bestowed upon him, or the policy of the law in granting it. And if it was

not a fraud in Edward Thomson so to employ his capital; it could not be so in the Nicolls to influence him to exercise the privilege to which he was legally entitled.

I now pass from the question of fraud to other objections to the plaintiff's right of recovery, which not having occured in the case of Conard vs. The Atlantic Insurance Company, will demand particular attention.

3. The third objection to the plaintiff's recovery is founded upon an acknowledged variance, though to a very trifling amount, in the number and description of the boxes or packages of teas between the declaration and the proof.

I do not understand the objection as being urged to the extent of defeating the action altogether; since the counsel who urged it could not but know that a mere variance as to number, magnitude, extent, &c. is immaterial, even in criminal prosecutions, unless the quantum be descriptive of the nature of the charge or claim(a). The objection is no doubt intended to apply to the damages claimed by the plaintiff, in case the jury may legally give any in this case. As to this view of the subject, I take the rule, in ordinary cases, to be, that the plaintiff can only recover according to his proof, where that falls short of the number, &c. stated in the declaration; but if it exceed, the plaintiff cannot recover beyond what his declaration demands.

Although the agreements between the plaintiff and the United States and their counsel, might, in this case, vary this rule unfavourably to the United States; still, as the difference between the number of chests stated in the declaration, and those given in evidence, is trifling in amount, I shall direct the jury to adopt the rule in ordinary cases, as already mentioned.

4. The next objection is of a more serious character. It is insisted that the transfers made by Edward Thomson to the plaintiff, under which he claims the proceeds in question, divested him of all, or nearly all, of his property; and that the plaintiff, in respect to the right of preference of the United States, is to be treated as a trustee or general assignee

(a) Stark. Evid. 1528, 1538.

[Conard *vs.* Nicoll.]

of the effects of Edward Thomson, within the meaning of the sixty-fifth section of the duty act of the 2d March 1799.

I take the rule, as now well settled by the supreme court, to be, that the preference of the United States does not extend to cases where the debtor has not made an assignment of the whole of his property. If the assignment leave out a trivial part of his property, for the purpose of evading the act giving the preference, it will be considered as a fraud upon the law, and the court will treat it as a total divestment(*a*).

But does this rule, or the reason upon which it is founded, apply to a *mortgage* of the whole of the debtor's property? I ask the question, and shall reason upon it without meaning to decide it; since it was not made or discussed at the bar. On the contrary, and for that reason, I shall instruct the jury to consider these transfers as absolute, so far as they concern the right of preference claimed by the United States.

The difference between a mortgage, and an absolute conveyance of the whole of the debtor's estate and effects for the benefit of a particular creditor or set of creditors, is, that in the latter case he divests himself of the whole, not only of his property, but of his credit, and his intention to do so is apparent from the act itself. If he be a merchant, he must stop; and the conclusion is inevitable, that the conveyance was made with a view to a legal insolvency.

But a mortgage does not necessarily divest the mortgagor of the whole of the property which it conveys. An equity of redemption still remains in him, which is property, worth to the owner of it all the difference between the value of the pledge and the sum for which it is pledged; which he may sell and convey, or devise; which will descend; and may be levied upon under an execution. Suppose that, from some of those circumstances which are constantly occurring to raise or to depress the market for particular articles of commerce, the teas in question had been worth, at the period of importation, greatly more than the amount for which these securities were given; the excess would have belonged, not

(*a*) United States *vs.* Hoel, 3 Cranch, 91.

to the plaintiff, but to Edward Thomson; *in which event* it would appear that no act of legal insolvency had been committed; and yet it was committed, if at all, at the time the securities or mortgages were given.

Neither does it follow that such a mortgage as has been spoken of destroys the credit of the debtor, compels him (if a merchant) to stop, or that it is given in contemplation of a legal insolvency. The reverse would seem to be the case, since (if the transaction be bona fide) the mortgage can be preferred to an absolute conveyance, for no other purpose but to avoid those consequences. I say, if made *bona fide*, because I admit, that if the mode of conveyance by way of mortgage or pledge be a mere device to defeat the right of preference of the United States, (a fact to be decided by all the circumstances of the case), it would be a fraud, and the mortgagee would be treated as a trustee to the extent of the claim of the United States.

I shall pursue this inquiry no farther; since, for the reason before mentioned, I shall instruct the jury to consider these securities, in reference to the question now under consideration, as if they were absolute transfers.

Evidence has been given in this case, that Edward Thom-continued his commercial transactions as usual, until the 16th or 17th of November 1825, when the Nicolls entered up judgments against him, which entirely prostrated him, so that on the 19th of that month he made a general assignment for the benefit of his creditors. The questions then for the jury under this head, will be, 1st, Was Edward Thomson insolvent and unable to pay all his debts at the time when these securities were given to the plaintiff? And 2d, Did they divest him of all his property, (or if not, was the part reserved trivial,) with intent to defeat the rights of preference of the United States? If these facts are proved to your satisfaction, then the transfers are to be considered as constructively divesting Edward Thomson of all his property, so as to let in the priority of the United States against the plaintiff. The cessation from business by Edward Thomson after the transfers, an intention to make a general assignment, and to commit an act of legal insolvency, at the time these secu-

rities were given, may be considered, if proved, as evidence that they were colourable and fraudulent as to the United States.

But if Edward Thomson, though unable to pay all his debts, did not divest himself of all his property, either actually or constructively; and if the securities were given bona fide to secure debts justly due to the plaintiff in the ordinary course of business; the right of preference of the United States did not attach as a consequence of those securities, so as to defeat the right of the plaintiff to the property in question.

The facts that Edward Thomson continued to transact his mercantile business, and to pay his debts as usual, and finally made a general assignment, not voluntarily, but by compulsion, may, if proved to your satisfaction, be considered as evidence that these securities were not colourable, or intended to defeat the right of preference of the United States.

5. The next subject of your inquiry is, whether the homeward cargoes, forming parts of the property in dispute, were the proceeds of the outward cargoes which were pledged to the plaintiff? Unless this fact be proved to your satisfaction, the plaintiff shows no title whatever to them. The evidence relied upon by the plaintiff is:

1st. The correspondence in amount and value between the outward and homeward bills of lading and invoices; except in one instance, where it was stated by Rodney Fisher part of the outward cargo was used for the disbursements of the ship.

2d. The delivery of the homeward bills of lading to the plaintiff, immediately on their arrival, by Peter Mackie, the confidential and chief clerk of Edward Thomson, before his failure, and one of his general assignees; through whose hands, and by whose agency, it is insisted, all these negotiations, from their commencement, were transacted, and who knew, better than any other person, to whom the respective bills of lading belonged.

3d. The evidence of Peter Mackie, which you have heard.

The fact must be decided by the jury, upon this and any opposing evidence given on the part of the defendants.

6. It is next objected that the securities in question were

given in consideration of *responsibilities* entered into by the Nicolls, and not for moneys actually paid by them for, or lent to, Edward Thomson.

In Conard *vs.* The American Insurance Company, it was objected that the debt for which the respondentia and other securities were given, was of too contingent a nature to uphold a mortgage as collateral security. In answer, it was said by the judge who delivered the opinion of the court, "We know of no principle or decision to warrant this conclusion. Mortgages may as well be given to secure future advances and contingent debts, as those that already exist, and are certain and due. The only question is the bona fides of the transaction."

I understand the objection now made to apply to the discharge by the Nicolls of Edward Thomson's respondentia bonds to the New York insurance offices. There is no proof, it is said, that these were paid by the Nicolls, but merely that they made themselves responsible to those offices that they should be paid.

But if you are satisfied, from the evidence before you, that the Nicolls discharged Edward Thomson from those debts, by taking up and delivering over to him the evidence of them, Edward Thomson from that moment became the debtor of the person who had thus discharged him; and it is not important to the plaintiff's recovery in this case to prove how the arrangement was made with those creditors, and that actual payment was made at the time when the securities in question were given. I know of no principle which prevents a person from taking a valid security, by respondentia or otherwise, in consideration of responsibilities entered into by him for debts due by the person giving them, which he afterwards pays off or satisfies, and from which he had discharged such person, as against his original creditor.

7. It is objected, on the part of the defendant, that the securities in question are usurious, inasmuch as they cover interest on the debts due by Edward Thomson to the Nicolls, from a period antecedent to the loans or advances which created the debts. If this should appear to the jury to be the fact, the charge of usury is made out, and the securities

[Conard vs. Nicoll.]

would be void, according to the law of the state of New York. But the law of this state is otherwise; it does not avoid the security, but merely prevents the creditor from recovering more than the legal interest. Whether more than legal interest was covered by these securities, or any, or either of them; and whether they were executed in this state or in the state of New York; are questions for the decision of the jury.

If the objection is intended to apply to the marine interest merely, it presents a different subject for consideration. Marine interest is allowable, though exceeding the rate of legal interest, as a compensation, not for *forbearance*, but for the *risk* which the lender assumes, by which both principal and interest may be lost by the casualties of the voyage. As to that, the question turns solely upon the bona fides of the transaction—whether the security given be a bona fide marine contract, bottomed upon property of sufficient value on board and at the risk of the lender, or is a mere device to cover an usurious transaction; and whether it was the one or the other in the present case, are questions for the jury to decide.

8. The last objection to the plaintiff's right to recover is, that the conveyances and securities given by Edward Thomson to the plaintiff amounted to acts of *legal bankruptcy*; in consequence of which the preference of the United States attached, and the plaintiff is to be considered as a trustee to the extent of the claims of the United States. The argument is, that these conveyances and securities, considering them as one transaction, would, according to the bankrupt laws of England, amount *to an act of bankruptcy*; and that the sixty-fifth section of the duty act of the 2d of March 1799, was intended to give to the United States a right of preference from the time when, according to that law, an act of bankruptcy was committed.

This is by no means the opinion of the court. The section refers to state bankrupt laws; and perhaps to a bankrupt law of the United States, when one should pass; but could have no reference whatever to the bankrupt laws of England. Nor does it, in my opinion, refer the right of

preference of the United States to *an act of bankruptcy* unaccompanied by some other act.

To understand the meaning of this section, we must construe the enacting clause and the proviso together. The former declares no more than that in all cases of insolvency, or where an estate in the hands of an executor, administrator or assignees, should be insufficient to pay all the debts of the deceased, the debts due to the United States should be first satisfied by those persons. It provides for only two cases, viz. a *living* insolvent, *having an assignee,* and a dead insolvent, represented by executors or administrators.

But the inquiry would naturally have arisen in the mind of the legislature; how is the expression *insolvency* to be understood? This is explained by the proviso; for which purpose alone, it is apparent, it was introduced. It declares that the expression shall extend to the following case, viz.

1st. Where a debtor, not having sufficient property to pay all his debts, shall make a *voluntary* assignment thereof for the benefit of his creditors.

2d. Where his estate and effects have been attached on account of his being an absconding, concealed, or absent debtor.

3d. To cases in which an act of legal bankruptcy shall have been committed; that is, as the construction of the proviso in connexion with the enacting clause seems necessarily to require, to cases where the property is in the hands of assignees, not by *voluntary assignment* only, but by assignment made in virtue of any state bankrupt law, or (possibly) of any bankrupt law of the United States which might thereafter be passed.

There must be an assignment, either voluntary or compulsory, or else there can be no assignee to be made liable to the United States under the enacting clause. If a mere act of bankruptcy be sufficient to give rise to the preference of the United States from the moment of its commission, where is the assignee who is first to satisfy the claims of the United States out of the estate of the debtor, under the penalty, stated in the enacting clause, of satisfying it out of his own estate.

[Conard *vs*. Nicoll.]

If it be said that when the assignment of the bankrupt's estate shall be made, the preference of the United States will relate back to the act of bankruptcy so as to overreach intermediate bona fide securities given by the insolvent to creditors: I can only answer, that the assumption is altogether gratuitous, and receives no countenance from any part of this or any other act on this subject.

The last question to be decided is, whether the jury are prevented by the agreement between the plaintiff and the United States or their counsel, or by the delivery of the property levied upon by the defendant to the plaintiff under the agreement, from giving damages in this case? I am clearly of opinion that they are not. As to the surrender of the property to the plaintiff, that could not, in an ordinary case, if put into the form of a plea, bar the right of the plaintiff to damages for an illegal taking, unless it were surrendered by the defendant, and received by the plaintiff *in satisfaction* of damages. But so far from the accord in this case having been *in satisfaction* of damages, the bond expressly stipulates that it is to be " without prejudice to any existing right."

The jury may therefore give such reasonable damages as the plaintiff has actually sustained by the seizure and detention of the property in dispute, in case they should be of opinion that the plaintiff is entitled to that property or to its proceeds. They ought not to give vindictive or speculative damages.

Upon the whole, if the plaintiff has established his right of property in the ships and cargoes claimed by him under the assignments and conveyances that have been given in evidence to establish that right; he is entitled to their proceeds and to your verdict in his favour, together with such damages as you may think him entitled to. If, on the other hand, he has failed to establish such right, or if in your opinion his title is invalidated by the objections, or some one or more of them, made to it, then the United States are entitled to the proceeds; and in that case you ought to find for the defendant."

The case was submitted to this court without argument,

[Conard *vs.* Nicoll.]

by Mr Berrien, attorney general, for the plaintiff in error, and by Mr Sergeant and Mr Webster for the defendant.

Mr Justice BALDWIN delivered the opinion of the Court.

This cause has been submitted without argument. It is in all its leading features, both in the points of law which arose and the evidence given at the trial, so similar to the case of Conard *vs.* The Atlantic Insurance Company, decided by this court at January term 1828, 1 Peters, 386, that we do not think it necessary to enter into an examination of the principles on which the judge submitted the cause to the jury. They appear to us to be in perfect accordance with the opinion delivered in that case, on great deliberation; of the entire correctness of which we do not entertain a doubt.

There is no error in the record of the circuit court, and the judgment is affirmed, with six per cent interest and costs.