**THE WILDWOOD.**

**AMTORG TRADING CORPORATION et al.
v. THE WILDWOOD et al.**

No. 14282.

District Court, W. D. Washington, N. D.

Nov. 13, 1941.

Bogle, Bogle & Gates and Edward G. Dobrin, all of Seattle, Wash. (Claude Wakefield, of Seattle, Wash., and Charles Recht, of New York City, advocates), for libelant.

Lord, Day & Lord, of New York City (George deForest Lord and Woodson D. Scott, both of New York City, advocates), for claimant-respondent.

Hayden, Merritt, Summers & Bucey, of Seattle, Wash. (Gerald H. Bucey, of Seattle, Wash., advocate), for claimant-respondent.

NETERER, District Judge.

The libelants seek $350,000 for breach of contract to carry cargo on the Steamship Wildwood to a foreign port. The libel was filed April 13th, 1940; and on April 17th, 1940, the American Foreign Steamship Corporation appeared as claimant and respondent, and filed a bond for the release of the vessel; on May 21st following an answer was filed. After survey of the cargo, at the port of Tacoma, where the cargo was landed, and the damage to the cargo ascertained, a supplemental libel claiming specific cargo damage, and cost of survey was filed; answer to the supplemental libel was filed. An amendment to the answer was filed on September 12th, 1941. The libelant will be referred to herein as Amtorg and the respondent as claimant. The libelant has sustained damage.

The defense to the libel is that there was no wrongful deviation; that the vessel was justified in discontinuing the voyage by reason of the extension of the British blockade to the Pacific Ocean, and

that paragraph 4 of the Bills of Lading under which the cargo was received expressly authorized such discontinuance of the voyage. The burden to establish this defense is on claimant. All damages to the cargo for which respondent is charged is denied.

Claimant also interposes the defense that in any event the "All-Union Combine" named as libelants are without legal capacity to sue, and have no interest in the subject matter. Defense is also made that the valuation clause in the Bills of Lading limits recovery in any event not in excess of $500 per package. This last defense was not pressed at trial.

The libelant Amtorg Trading Corporation is organized and existing under the laws of the State of New York. In addition to Amtorg Corporation. five "All-Union Combine Organizations" of the U. S. S. R. to-wit, "Stankoimport", "Machinoimport", "Technopromimport", "Raznoimport", and "Promsyrioimport", are named as libelants; said Combines were organized and exist under the laws of the Union of Soviet Socialist Republics. Amtorg is shipper of all of the involved cargo either as "Amtorg Trading Corporation" or as "Amtorg Trading Corporation as agents." All Bills of Lading are in the same form. Freight was prepaid by Amtorg, also all expenses having relation to the shipping were paid by it. The cargo was consigned to the order of one of the "All-Union Combine Organizations." Since the filing of this libel all of the "All-Union Combine Organizations" have executed in due form by their proper officers, assignments to libelant Amtorg Trading Corporation of all right, title and interest whatsoever in connection with the subject matter in this action.

Amtorg through its ship brokers in New York City arranged charters for two vessels owned by the American Foreign Steamship Corporation, with the claimant, for carriage of cargo from an Atlantic Coast port to Vladivostok. Through the activities of the ship brokers the charter party agreements were executed, on December 5th, 1939, one of which was for the Steamship American Robin, and the other for the Steamship Liberty Glo. On December 12th, 1939, the charters were changed or substituted for booking agreements. On January 20th, 1940, a new rate circular was issued, as follows: So far as having any bearing here, the rate

circular omitting paragraphs 1, 2, 3, 4, 7, 9, 11, 12, 13, 14, reads as follows:

| "Issued: | effective: |
|---|---|
| "January 20, 1940 | January 20, 1940 |
| All Commodities. | $16.00 per ton of 2240 lbs. |

"Par. 5—Demurrage, if incurred, payable by shippers to owners at the rate of $750.00 per day or pro rata for any part of a day at ports of loading and discharging."

"Par. 6—Vessel will allow shippers despatch money at the rate of $375.00 per day or pro rata for any part of a day for all time saved to the ship."

"Par. 8—Vessel is to be free of wharfage and/or dockage, such charges at the port of loading to be paid and borne by the shipper and at the port of discharge by shipper or consignee."

"Par. 10—Steamer to supply for loading and discharging winches (up to 3-ton lifts), steam power to run winches, derricks, gear, lights by day and night, also Sundays and Holidays, if required, free of expense to shippers."

On January 20th, 1940, confirmation was signed by Amtorg, and the vessel presented, as ready for loading February 10th, 1940. The Wildwood was thereafter substituted for the Steamship "Liberty Glo" and was tendered for loading at Claremont Terminal, Jersey City, New Jersey. Loading was completed, and the Wildwood sailed February 19th, 1940, for Vladivostok. All of the Bills of Lading were issued by claimant for the cargo which consisted of machinery, brass, steel, copper and miscellaneous items; the value of the cargo was approximately $4,000,000. Freight was prepaid by Amtorg in the sum of $111,558. The Wildwood was an American vessel and was flying the United States of America flag. While the Wildwood was on the high seas approaching Honolulu, the libelant received information that the port of Vladivostok was congested by reason of many vessels lying in the harbor awaiting opportunity to discharge; that it approached claimant for change of port to Petropavlovsk as port of first call. Claimant asserts that Amtorg agent said: "If we go farther north it will avoid the blockade." On March 18th, 1940, the respondent addressed the

libelant Amtorg Trading Corporation, as follows:

"This will confirm conversation with you today wherein we agree to divert the above steamer to Petropavlovsk, Kamchatka, one (1) port only for the bonus of $3,800. in addition to all freight we have collected from you against the steamer's cargo, with your option of calling at Petropavlovsk and Vladivostok for an additional sum of $4,000.00 to the above, with the understanding that lay time, in accordance with the charter party, is to only be figured on the basis of one (1) port; that is the first port of call. No notice of arrival or readiness will have to be submitted at the second port and time is to commence immediately upon her arrival.

"Also, any and all port charges incurred at the second port that would normally apply against the steamer, as in the case of the S. S. 'American Robin', are to be divided between us—50% each. It is also understood and agreed that you are to supply us at five (5) days notice with 600 barrels of bunker oil at $2.50 per barrel at Vladivostok if it is necessary for us to have same.

"All other terms and conditions are in accordance with the original booking and Bills of Lading.

"This offer is subject to your declaring to us within six (6) days from today your final and definite arrangements as to the route and destination of the vessel.

"(Signed by respondent)

"P.S.—It is also agreed that if additional marine and war risk insurance is necessary, that you agree to pay us up to $250.00. It is also understood that port Petropavlovsk is safe where steamer can always lie afloat."

On the 23rd day of March, 1940, the respondent sent the following letter to Amtorg.

"In connection with the agreement to divert the S. S. 'Wildwood' to Petropavlovsk, conditions of which are fully set forth in our letter to you of March 18th, we wish to confirm conversation of this date, whereby we agree to cancel the charge against you for any additional marine and war risk insurance due to the deviation, in consideration whereof you agree to accept the sum of $2,302.08, paid you on February 20, 1940, as settlement in full for despatch earned by the S. S. Wildwood loading at Claremont, New Jersey.

"(Signed by respondent)

"Accepted: Amtorg Trading Corp.

"Mr. Vasseliev"

This letter was returned March 25, 1940, by the libelant Amtorg Trading Corporation.

"Re:SS. Wildwood

" We are enclosing your letter of March 23rd duly signed by our Mr. Vasseliev and are retaining the copy for our files."

"Signed Amtorg Trading Corporation

"(J. Feinstein.)"

The name Vasseliev was signed on the blank space provided in claimant's letter. The Wildwood left Honolulu, March 21st, and took the course for Petropavlovsk. The distance from Honolulu to Petropavlovsk is 2,762 miles.

On March 26, 1940, the master sent a message to the respondent, "Observe condition Petropavlovsk Hydrographic Publication advice facilities discharging."

On receipt of the message the claimant sent to the S. S. Wildwood, "Last message not clear explain further also give present position."

The master replied: "Satisfactory advice conditions Hydrographic 122 page 118 improved."

On page 118 of the Hydrographic Publication of 1932 which is also included in the supplement to Hydrographic Publication 1939, under head line "Petropavlovsk harbor" "Ice". "The harbor is frozen over from latter part of October to the early part of May."

On March 28th, 1940, at 2.6 p. m. the claimant by radiogram to the master of the Wildwood said: "Return Seattle immediately confirm also state present position."

On the same day the claimant notified Amtorg that it was obliged to "order the S. S. Wildwood to return to Seattle, Washington, by the following letter."

"American Foreign Steamship Corporation
"80 Broad Street
"New York.
                              "March 29, 1940
"Amtorg Trading Corporation,
"210 Madison Ave.,
"New York, New York.
"Gentlemen:
"With reference to the voyage of the S. S. 'Wildwood', I am writing to give

you formal notice that we have been obliged to order the vessel to return to Seattle.

"Apparently reliable information in the morning papers of March 27th and on the ticker state that two ships bound for Vladivostok have been interrupted by the British Government and taken to a Chinese port. Not only has the British Government not denied this, but we have apparently reliable information to the effect that the British claim the right to interrupt any neutral vessel containing cargo of materials of such a nature that they would be of aid to Germany if transported from Vladivostok to Germany.

"Our counsel in Washington advises us that he has contacted the Soviet Embassy to ascertain whether any assurance can be given by the Soviet Union and has been unable to obtain such assurances. The Soviet Embassy in Washington having notified our counsel that commercial problems of this kind must be taken up first with the Amtorg Trading Corporation. We have taken the matter up with you and have met with your insistence that we proceed for the completion of the voyage in spite of the hazards above-mentioned and without safeguard.

"Under these circumstances, it is necessary for us to give you formal notice that we are exercising our rights under paragraph No. 4 of the Bills of Lading to have the vessel return to Seattle, it being our firm opinion, after careful consideration, that it would not only be dangerous for us to proceed to Vladivostok, or any other Russian port, with a cargo containing copper bars, but that it also might involve loss of the vessel or its detention for a substantial period if seized by the British Government.

"Very truly yours,
"American Foreign Steamship Corporation
"Signed F. Riker Clark
"President."

To this letter libelant replied as follows:
"April 3, 1940
"American Foreign Steamship Corp.,
"80 Broad Street,
"New York City,
"Att. Mr. F. Riker Clark
"President.
"Gentlemen:

"We are in receipt of your letter of March 29th, notifying us that you have been obliged to order the S. S. Wildwood to return to Seattle.

"We are very much surprised at your decision in this matter in view of the fact that as late as March 18th, you confirmed the diversion of the S. S. Wildwood to Petropavlovsk by mutual consent.

"Under the circumstances, we cannot agree that you are justified in diverting the vessel from its destination and hereby serve notice on you that we will hold you fully responsible for any loss or damage whatsoever which may result by reason of your unauthorized diversion of the vessel.

"Very truly yours,
"Amtorg Trading Corporation,
"S. Vasseliev, Director
"Transport Dept.

"AV:FZ"

Paragraph No. 4 of the Bills of Lading reads as follows: "In any situation whatsoever or wheresoever occurring and whether existing or anticipated before commencement of or during the voyage, which in the judgment of the carrier or Master is likely to give rise to capture, seizure, detention, damage, delay or disadvantage to or loss of the ship or any part of her cargo, or to make it unsafe, imprudent, or unlawful for any reason to proceed on or continue the voyage or to enter or discharge the goods at the port of discharge, or to give rise to delay or difficulty in arriving, discharging at or leaving the port of discharge or the usual place of discharge in such port the Master, whether or not proceeding toward or entering or attempting to enter the port of discharge or reaching or attempting to reach the usual place of discharge therein or attempting to discharge the goods there, may, without giving any prior notice, discharge the goods into depot, lazaretoo, craft, or other place and the goods shall be liable for any extra expense thereby incurred; or the Master may proceed or return, directly or indirectly, to or stop at such port or place whatsoever as he or the carrier may consider safe or advisable under the circumstances, and discharge the goods or any part thereof there without giving any prior notice, and when landed as hereinabove provided, the goods shall be at their own risk and expense, the delivery thereof by the carrier shall be considered complete and the carrier shall be freed from any further responsibility in respect thereof except to mail notice of the disposition of the

goods directed to the skipper or consignee named in this Bill of Lading at such address as may be stated herein; or the Master may retain the cargo on board until the return trip or until such time as he or the carrier thinks advisable; or the Master may forward the goods by any means by water or by land, or by both such means, at the risk and expense of the goods. For any services rendered to the goods as hereinabove provided, the carrier shall be entitled to a reasonable extra compensation."

The master of the Wildwood before leaving port in New York secured a copy of the 1932 edition "H. O. No. 122 sailing directions for Siberia and Chosen" U. S. Navy Department Hydrographic, also the 1939 Supplement.

Assuming, but not finding, that the claimant's contention is true, the testimony shows that the harbor of Petropavlovsk consists of an inner harbor, and an outer harbor. The inner harbor is shallow and is used by the fishing industries, and is frozen over during the winter season. The outer harbor is a deep water harbor, and does accommodate vessels of deep sea draft such as the Wildwood; and is not frozen over from October to May as shown by two masters of deep sea vessels who have been going into this harbor during every month in the year. There is no contradiction of this testimony save the Hydrographic Publication by the U. S. Navy, and like publication by the U. S. S. R. There are two piers at this harbor, one at Cape Signal, and the other near "Cat" which means "close to the shallow". On the outer harbor for discharging cargo is a 120-ton floating crane, and two smaller cranes which move along the side, 7-ton each. The discharging facilities are good. The Wildwood was engaged in a commercial enterprise, and not sailing of Navy vessels, and had engaged and received pay to deliver the cargo, and all information now produced was available. The facilities at Honolulu during March and April, 1940, for discharging and warehousing 6,000 tons of copper, brass, machinery and general cargo were adequate. They were on a par with discharging facilities at San Francisco, Seattle, Portland and Tacoma.

Before entering upon the voyage from the port of New York there was much discussion about war hazards, because of war conditions in Europe and Asia which had extended likewise to the Pacific Coast. The seamen on the Wildwood declined to sail unless they were given a bonus for the war hazard; several conferences were had between claimant, and delegates of the seamen and the National Maritime Seamen's Union with relation thereto, and an agreement resulted wherein the seamen were given 25% in addition to their wages with a minimum of $25 to each seaman, and also group insurance covering the seamen throughout the voyage on behalf of each seaman for loss of life, and was also given indemnity for the loss of personal effects limited to $150.

The claimant knew, or should have known, that on January 13th, 1940, the Soviet vessel Salenga was detained by the British and taken into Hong Kong for examination, and that on January 21st, 1940, the British stopped the Japanese liner Asma Maru 35 miles off the coast of Japan, and took off 21 German sailors; that on January 24, 1940, the British seized the Tatutu Maru between the West Coast of United States and Honolulu; and during January, 1940, the Japanese seized a British vessel in the Sea of Japan and detained it for several hours. The claimant knew, or should have known, of the seizure and sinking of various vessels on the Atlantic Coast by the belligerent between October 8th, 1939, and the departure of the Wildwood from the port of New York.

The claimant officers were readers of the New York Times as well as the other publications in evidence. To indicate the war atmosphere surrounding the booking agreement and time of the vessels departure, and for no other purpose the court admitted clippings from the New York Times of September and October of the seizures of the U. S. vessel carrying metal to Germany by the British and French; the seizure of the City of Flint by Germans in October, 1939, and taken to Murnansk; also a clipping from the same paper October 25th, 1939. The claimants knew, and must be charged with knowledge, of the seizure of U. S. vessels by the British and French during September, October, November and December, 1939, and of the blockade of the German ports by the British in September, 1939, following the declaration of war on September 3rd, and likewise the contraband property included in the blockade, and that on December 1st, 1939, the British announced

a "total blockade of Nazi trade" covering the Atlantic and Mediterranean; and publication on November, 1939, in the New York Times of a list of U. S. vessels detained by the British and French, and also the seizure of U. S. Mail, and that the State Department was "studying the cases but was not prepared today to say whether diplomatic representation would be made to Great Britain;" and on December 5th, 1939, the New York Times under head line "Total blockade should end Nazi trade."

"Word had been received before the blockade order went into effect that all control ships were in position. Most of them were in the North and Mediterranean Seas and the Atlantic Ocean. Allied ships all over the world, however, will participate in the blockade so that should German exports evade the cordon near home they still would be subject to seizure."

"Seized cargoes will be taken to the nearest Allied ports having control stations, and will be turned over to Prize Courts which in practical effect may do with them as they choose."

On January 14th, 1940, the head lines "Hong Kong puts hand on Nazi shipments the New York Times says".

"The first ship was brought into Hong Kong this morning for cargo contraband examination. She is the Russian steamer Salenga, which was intercepted by the British Navy and brought into the harbor by naval personnel."

On February 9th, 1940, the New York Times stated that from September 3rd, 1939, to February 8th, 1940, 138 neutral vessels totaling 365,504 tons had been sunk; on February 22nd, 1941, it stated "The number of neutral vessels sunk total 165."

On March 1st, 1940, the New York Times again referred to the seizure of the Russian ship Salenga, based on the news in a Tokyo report of March 1st, 1940, stating that the Soviet Far Eastern fleet may escort Russian merchantmen in the Far Eastern water "unless the British release 'Salenga' recently seized and taken to Hong Kong while carrying tungsten and antimony to Vladivostok consigned to Germany." The Times article on March 2nd, 1940, also states:

"The Hochi Shimbun's report coincides with a display of interest in a statement by the British Minister of Economic Warfare indicating that Britain may extend contraband control to the vicinity of Vladivostok to close Germany's Siberian route.

"The newspaper Asahi observes that the establishment of Anglo-French contraband control areas in the Pacific and the Japan sea might lead to serious developments. That paper conceded that if British actions were kept strictly within international law it might not be objectionable, but the extension of economic warfare to the Far East would demand the Japanese Government's serious attention."

"Still another newspaper, the Nichi Nichi, discusses the possibility that British control may be extended to the seas around Vladivostok, but concludes that Britain would hesitate to attack Russia."

Relations between British, French and U. S. S. R. continued unfriendly. March 7th, the New York Times reported that Ivan Maisky, Soviet Ambassador to Britain, insisted on the prompt release of the Russian steamship Salenga. The New York Times March 19th, 1940, stated a French warship halted a U. S. vessel on February 25, 1940, 100 miles off Venezuela which was well within the American safety zone. On March 27th, 1940, the New York Post stated that the British Navy had seized a Russian ship carrying copper from San Francisco en route to Hong Kong. The seizure was reported to have been made in the North Pacific. The vessel was the Russian vessel Mayakovsky. The incident of the Salenga seizure on January 13th, 1940, was reviewed as follows:

"British relations with Russia are likewise growing more tense. Announcement is made of the seizure of a Russian ship bound from the U. S. to Vladivostok with American copper. The allies who for some weeks have been arguing that Vladivostok is the back door by which Germany is getting American war materials have begun to do something about it."

"Yet the Anti-Russian spirit in England is far less active than in France. From all indications there are still some members of Chamberlain's government who cling to the hope that Stalin may yet be won away from Hitler."

The New York Sun states: "It is reported that the Soviet steamship Valdimir

Mayakovsky had been detained at Hong Kong pending examination of her cargo by British authorities."

The New York Herald Tribune states:

"Near Japan the Mayakovsky was hailed by two British warships and diverted to Hong Kong, where another Soviet steamer, the Salenga has been tied up since January 13th, after being halted near Formosa, bound for Manila from Vladivostok with a cargo of tungsten, tin and antimony."

"The Soviet government does not recognize the British blockade as a legal weapon for a belligerent nation. Several times Ivan Maisky, Soviet Ambassador at London, has protested to the Foreign Office about the Salenga and pressed for her release. Today he called again and saw Foreign Secretary Viscount Halifax, to enter a protest about the Mayakovsky."

"It is believed in London that the British intend to make test cases of both Soviet freighters, to force the Russians to agree to some form of limitation on the amount of vital war materials which they import from the United States across the Pacific. Since the out break of war, the British have noticed a large increase in the scale of trans-Pacific traffic in American copper, petroleum, molybdenum and other materials useful in war. The suspicion is that the Russians are passing some of it on to Germany."

The New York Times stated:

"London, March 27—Ivan M. Maisky, the Russian Ambassador called on Viscount Halifax, the Foreign Secretary, today and protested vigorously against the British detention of Russian ships in the Pacific. The Ambassador demanded the immediate release of two Soviet ships now being held in Hong Kong and said that British interference with Russian vessels 'has created an extremely bad impression in Moscow.'

"The ships in question are the Salenga of 2,492 tons and the Vladimir Mayakovsky of 2,261 tons. The Salenga, laden with tin, antimony and wolfrom, was stopped by British warships off the island of Formosa on Jan. 13th, while en route from a Chinese Port to Vladivostok."

"The other ship took on about 4,000 tons of American copper at Manzanillo, Mexico, and touched at San Pedro, Calif. where she loaded more metal. She was intercepted by another British warship, which took her immediately to Hong Kong."

No other neutral vessels were detained or seized in the Far East; no vessel flying the United States flag had been stopped or detained in the Pacific. The British and French had maintained a contraband patrol in the vicinity of Hong Kong since prior to the seizure of the Russian steamship Salenga on January 13th, 1940. The Salenga and Mayakovsky seized for contraband, and for inspection of cargo, in the same manner that vessels were detained on the Atlantic and Mediterranean. The Blue Network of the National Broadcasting Company, radio program during January, 1940, told of strained relations between the U.S. and the U.S.S.R. and demands in Congress for the withdrawal of the U.S. Ambassador to the U.S.S.R.; and also that the U.S. was vigorously protesting contraband inspection, and taking American ships in the war zone for this purpose; also that U.S. vessels were being detained for a longer time than other neutral vessels and that Britain was breaking with the U.S.S.R. diplomatically, and this subject was discussed in the House of Commons at London.

On the Red Network of the National Broadcasting Company similar reports were carried.

On January 13th, 1940, the Associated Press news broadcasted at 10 a. m. "Hong Kong. British Naval vessels today brought the 2,492 ton Russian steamer Salenga to this port to examine her cargo for contraband." This was re-broadcasted the same day as an Associated Press bulletin in English, Portuguese, German, French and Spanish; on January 15th, 1940, the same radio broadcast said "Hong Kong. Agents for the 2,492 ton Soviet steamship Salenga brought her in for contraband examination, called 'Moscow' today urging that a protest be sent to London demanding immediate release."

This broadcast was in four foreign languages. The National Broadcast Network carried daily reports of the strained relations between the U.S. and the U.S.S.R. and demands for diplomatic break; and also to the continuing British interference with American shipping and vessels. Conditions in these relations were bad and continually in the news during December, 1939, January, February and March of 1940. There were no spectacular developments which materially altered general

world conditions after the booking agreements and departure of the Wildwood on February 19th, except seizure of the Mayakowsky on March 15th, and none after the vessel left Honolulu on March 21st.

The Wildwood left the port of New York, on February 19th, 1940, enroute to Vladivostok; after leaving the Panama Canal water was found in the steward's storeroom of some depth—of 4 inches or more—and some of the steward's stock was damaged, and cast overboard; the salt water likewise contacted a part of the cargo.

In addition to $111,558 freight prepaid, Amtorg paid $3,800 "bonus" to divert the Wildwood to Petropavlovsk, and an additional $4,000 for calling at Vladivostok; and $17,000 freight to Tacoma from point where the vessel returned, and $39,558 stevedoring, wharfage, storage, etc., charges at the port of Tacoma.

█ Amtorg, the shipper, is the real party in interest; it exercised all act of ownership and control over the cargo after shipment. The claimant recognized this, and by negotiation, notices, and demands confirmed libelant's belief that it is the sole party in interest. Claimant demanded payment of large sums, on return to the port of Tacoma, under threat of libel, and sale of the cargo, demanded return of all Bills of Lading, which were returned unendorsed, by consignees, and claimant delivered to Amtorg the $4,000,-000 cargo, and now to deny that Amtorg is the real party in interest is a breach of good faith, and violative of good morals as a rule of policy for the court to permit the truth of such admissions and conduct to be denied by the claimant. Admiralty is not a court of equity, it does, however, administer equitable principles, arising in a proceeding in admiralty. While such doctrine is not founded on contract, nor on ethical principles, it is predicated, in common law upon the custom of merchants. It was first adopted in English chancery courts, and afterward by the courts of law. That upon the facts in this case such right to libelant is not precluded is shown in Conard v. Atlantic Ins. Co., 1 Pet. 386, 26 U.S. 386, 7 L.Ed. 189.

█ It may also be said like the lien of a sailor, or the lien of the vessel for the return freight charges—$17,000—; and port of Tacoma charges $39,558 for discharging cargo, wharfage, storage, etc., payment of which subrogated Amtorg to the liens of the vessel and port charges; and surrender of the Bills of Lading to Amtorg Trading Corporation by the consignee, and assignment of all claims to Amtorg Trading Corporation, gave Amtorg the added status of purchaser, under judicial sale on establishment of liens in foreclosure, and the delivery of the cargo to Amtorg Trading Corporation, on surrender of the Bills of Lading to claimant restored full title to Amtorg Trading Corporation from any viewpoint of approach. Transmarine Corp. v. Levitt & Co., 2 Cir., 25 F.2d 275, at page 278.[1] Status of Amtorg Trading Corporation to sue is clearly shown in The Speybank, D.C., 28 F.2d 436. It may be added that there is nothing in this case to show that the All-Union Combine Organizations have not their own purposes, as well as those of the U.S.S.R., and interest in profit on their own account.

It is not necessary to determine whether these Combines are distinct entities, even though the evidence appears to establish such fact. They have no interest in this controversy.

█ No claim was made that the cause of deviation was by reason that the port of Petropavlovsk was "icebound", and cargo could not be discharged until the early part of May when the answer was filed May 21st, 1940. But assuming, not finding, that the destined port was "icebound", the vessel was ordered to return on March 28th, 1940, at 2.6 p. m. It left Honolulu on March 21st on a course to Petropavlovsk. There is testimony that the vessel was approximately 1,200 miles on its course from Honolulu. It had 1,562 miles to cover, and in due course it would have arrived at Petropavlovsk during the second or third week in April. If the "Navy shipping directions" are taken as the fact, and the testimony of

[1] National Interocean Corp. v. Emmons Coal Mining Corp., D.C., 270 F. 997; The Cabo Villano, D.C., 14 F.2d 978; United States v. United States Steel Products Co., D.C., 27 F.2d 547, 549; The Speybank, D.C., 28 F.2d 436; Aunt Jemima Mills Co. v. Lloyd Royal Belge, 2 Cir., 34 F.2d 120; The Nichiyo Maru, 4 Cir., 89 F.2d 539.

two sea captains who said they sailed deep sea vessels into this harbor during every winter month be disregarded, then the Wildwood would have been able to discharge cargo in two or three weeks, in less time perhaps than if it had continued to, and reached, Vladivostok. There was no threat to blockade this port, no vessels of any kind had been seized or even challenged, nor was it within the threatened war zone. If the ship had been delayed for a month or longer it was fully protected for delay by lien on approximately $4,000,000 cargo, by the stipulation in shipping agreement, and no reasonably prudent master, acting for the ship and cargo, would have frustrated the voyage because of "icebound" port; and the facilities for discharging cargo were quite sufficient. It is not shown that the vessel was in the war zone at the time. One of the claimant officers, on settlement for the "war bonus", with the seamen sought to avoid the payment, and claimed the vessel was not in the war zone. There was no war activities along this course, or port, or threatened. Proctor for claimant in argument says: "The Vladimir Mayakowsky was seized Friday, March 15th, at a point off Hakadate straits en route to Vladivostok, on Monday the 18th, libelants executives called on claimant's executives for diversion of the Wildwood. Radiograms were sent libelant's agents to Honolulu, and to the Master of the Wildwood." Claimant, states that Vassiliev for libelant stated: "It is more safe to go further north than to go to Vladivostok, on account of the blockade." The vessel left Honolulu March 21st. On March 26, 11 p. m., the master radioed claimant "Observe conditions Petropavlovsk Hydrographic Publication advice facilities discharging." He said nothing about war danger. Claimant on receipt of this message sent this message; "Last message not clear explain also give present position." The master replied, "Satisfactory advice conditions Hydrographic 122 page 118 improved." Assuming as stated by claimant that vessel was deviated to Petropavlovsk because it was safer "on account of the blockade", the claimant had personal notice of the war conditions, and the blockade, and agreed to the deviation, took $3,800 as additional freight to Petropavlovsk and $4,000 more, including call at Vladivostok.

Not until the master wired, or radioed, his inquiry of discharging facilities at Petropavlovsk does cancelling of the voyage appear, and the order was given to return to Seattle approximately 10 days after the negotiations March 18th, for the change of voyage. The reason for cancellation did not appear in the message, but the war condition was given in the notice by letter to Amtorg. It is also said the master would have returned on his own motion because of war conditions had he not had radio facilities on the ship so he could communicate with the claimant. This statement is out of harmony with the conduct and acts of the master. When he received the order to return he exhibited it to the chief officer and said: "What do you think of that?"

The chief officer on cross-examination in response to the question said: "Q. Will you be good enough to tell us exactly the conversation you had with the master relating to the return of the ship and the cause for the return—what did he say to you, and what did you say to him? A. When he received the telegram from Mr. G. Ginsberg referring to the cable to return back, received around 10 o'clock or a little before that, he never said a word 'see this'. He handed it to me and said: 'What do you think of this?' I said, 'That is fine.' "

Again he said on examination with relation to conversation among the crew.

"Q. When did you begin to have those discussions? A. Probably from the time we left New York, more or less. * * *

"Q. Approximately how many days out of New York? A. I could not say—probably before we left New York, it was the general conversation on the ship at all times.

"Q. Even before you left New York? A. Even when we heard we were going to Vladivostok it started.

"Q. Who started it? A. O, I couldn't say, everybody was talking about it, it was just a general conversation on the ship at all times.

"Q. Did you have other conversations with the Master, other than you have testified to, about the return of the ship at any time during the voyage? A. It seemed like everybody had a radio on the ship, and different stuff and different news, and when you sat at the dinner table any time during the day, every one talked about what was heard over the radio, and that naturally led

to tightening up the blockade and Russian ships, and that was more or less, practically every mealtime, talk about it among officers, of course.

"Q. You say that this was about Russian ships? A. No, No ship.

"Q. Was there anything on the radio about any ships except about Russian ships being stopped? A. I don't recollect. There was not much talk, I don't remember. We remembered the Russian ships because that was the day before we turned back, and I remember especially of course a friend of mine was chief officer on the ship that took the material to Manzanillo, Mexico to transfer to the Russian ship, so I was naturally interested. * * *

"Q. And your ship was an American ship flying the American flag? A. American ship.

"Q. Did you hear anything about any American ships being stopped by the blockade or British authorities? A. No, I didn't hear of any."

It is obvious that the proximate cause for order to return was given because of "icebound port" and lack of facilities for discharging.

It is clear that the master knew of the "Russian ships" seizure. No concern of the crew of greater danger is shown. The master and ship were nearer the war and seizure zone, yet he was concerned only about "the icebound port". He said nothing about war danger. The minds of the master, and executives of claimant were out of harmony, one "icebound port", the other seizure because of war. The master, speaking from the immediate danger zone, saw no greater danger of seizure than at beginning of the voyage.

■■ The war risk was in the contemplation of the parties when the booking agreement was made; and also when the deviation to avoid "blockade and seizure" was effected. The claimant can not justify frustrating the voyage agreement because threatened blockade of Vladivostok by the belligerent unless there were increased hazards to shipping than existed at the inception of the voyage to such a degree as would move reasonably prudent men. "It is an undeniable truth that a person's liability for his acts depend upon their tendency under the circumstances known to him." 20 R.C.L. sec. 8, 9. It was the duty of the ship to deliver the cargo at Petropavlovsk unless there was a change in the "World War" conditions, which increased the hazard to the Wildwood to a degree which would have deterred a reasonably prudent sailor from proceeding. 45 C.J. Sec. 25, pp. 651–653. While no increased hazard as to Vladivostok is shown, the diversion to Petropavlovsk lessened the danger, as it "took the ship farther north", and away from the war danger.

■ Under the "excusatory clause" 4, performance is not optional with the ship. Such contention is unenforceable. City of Pocatello v. Fidelity & Deposit Co., 9 Cir., 267 F. 181.

■ Execution of contract is binding, and deliveries must be made, unless of such hazardous conditions, arising after entering into the agreement, at inception of voyage, or deviation of voyage, threatening seizure, or destruction of the cargo, and jeopardizing the safety of the ship, which would have moved a reasonably prudent master or owner under such circumstances. Bernstein v. W. B. Mfg. Co., 235 Mass. 425, 126 N.E. 796; The Republic of Spain v. North of Eng. S. S. Co., B.D.1938, 54 Thymes Law Rep. 852; Luckenbach S. S. Co. v. W. R. Grace & Co., 4 Cir., 267 F. 676, certiorari denied, 254 U.S. 644, 41 S. Ct. 14, 65 L.Ed. 454. The contract must be held to be made in the light of, and reference with, the known war conditions. Balfour, Guthrie & Co. v. Portland & A. S. S. Co., D.C., 167 F. 1010.

The test of what is reasonable in the sense applied in such cases usually arise in very different circumstances, and must be decided when the issue arises from the facts established, and from the viewpoint of sound business reasons to conclude as right and justice dictate. From this point of approach and the facts established I can not conclude otherwise than that the master and owners were not warranted in frustrating the voyage, nor are the cases cited by claimants in point, it is the facts that control, there can be no dispute on the applicable rule of law.

■ The claimant is bound to see that the Wildwood was seaworthy at the beginning of the voyage, and keep it in proper repair, unless prevented by the perils of the sea, or unavoidable accident. If defect without any apparent cause developed in course of voyage, the presumption is that it existed at the inception of the voyage. The Fort Gaines, D.C., 21 F. 2d 865; Federal Forwarding Co. v. Lanasa,

4 Cir., 32 F.2d 154; Luckenbach v. W. J. McCahan Sugar Co., 248 U.S. 139, 150, 39 S.Ct. 53, 63 L.Ed. 170, 1 A.L.R. 1522; The Caledonia, 157 U.S. 124, 15 S.Ct. 537, 39 L. Ed. 644. The Harter Act, § 3, 46 U.S.C.A. § 192, reduces the warranty of seaworthiness to a warranty of diligence to make the vessel seaworthy; see The Carib Prince, 170 U.S. 655, 18 S.Ct. 753, 42 L.Ed. 1181. The Circuit Court of Appeals in Bethlehem Shipbuilding Co. v. Joseph Gutradt Co., 9 Cir., 10 F.2d 769, said, in effect, that the duty of the shipowner to make the ship seaworthy is a personal one to see that it is seaworthy when it starts on the voyage. He also must know that those whom he employs to act uses due diligence. International Nav. Co. v. Farr & Bailey Mfg. Co., 181 U.S. 218, 21 S.Ct. 591, 45 L.Ed. 830. The cargo must be stowed in view of the conditions of the ship. This ship had no drain pipes from the chain locker to bilges No. 1 lower hold; and "no scrupper filter." "The scrupper constitute an opening in the bulkhead." The place where the chain comes into the chain locker is covered with steel, or cement, or wood; and then covered with canvas. The function of this is likely to be impaired by strain of the ship in rough sea. During a storm the vessel "shipped sea in the forecastle head" and no doubt the water found its way into the chain locker, and filtered into No. 1 hold, to a depth of at least 4 inches—a "rusty mucky substance,"—in which the cargo was stowed. The stowage of the cargo on the bottom of this hold was improper, in view of the condition of the vessel in the relation stated. The Mississippi, D.C., 113 F. 985; Spreckels & Bros. v. Corsar, 9 Cir., 141 F. 260.

The diligence relied upon is surveys made by competent surveyors on July 21st, July 28th and August 1st, 1939, by the American Bureau of Shipping Representatives, approximately six months before sailing.

The burden of proof by a fair preponderance of the evidence to justify return, and also of seaworthiness of the ship, and reasonable diligence under the "Harter Act" to make it seaworthy, rests upon the claimant. This burden has not been sustained.

Ordinarily the vessel, perhaps, should have gone to Honolulu, the nearest "American" port having a safe harbor and efficient discharging facilities, but on April 3rd, while the ship was en route to Seattle, Amtorg by letter requested that the vessel proceed to the port of Portland; this was denied. The libelant is entitled to recover loss sustained by reason of landing at Tacoma instead of Portland.

Findings, conclusions, and form of interlocutory order, will be prepared and served upon opposing proctors, and presented to the court, for disposition at the opening of court at 10 o'clock a.m. November 24th, 1941. Admiralty Rule No. 46½, 28 U.S.C.A. following section 723. Unless the parties agree upon the amount of damages sustained by the libelant within 30 days, or such further time as the parties may agree upon, with consent of the court, the case will be assigned for hearing upon the question of damages, before one of the judges of this court, or will be referred to an assessor to hear the parties, and make report herein. Admiralty Rule 43.